587 So.2d 848 (1991)
Gerald James HOLLAND
v.
STATE of Mississippi.
No. 90-DP-0024.
Supreme Court of Mississippi.
September 11, 1991.
*851 Earl B. Stegall, Gulfport, for appellant.
Mike C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, Cono A. Caranna, II, Dist. Atty., Gulfport, for appellee.
En Banc.
PRATHER, Justice, for the Court:

I. INTRODUCTION
In September 1986, Gulfport police arrested 49-year-old Gerald James Holland for the murder of 15-year-old Krystal D. King. The Harrison County Grand Jury subsequently indicted Holland for capital murder and the underlying felony of rape. Venue changed to Adams County, where a jury in December 1987 found Holland guilty and sentenced him to death. Holland appealed. This Court affirms the conviction, overturns the death sentence, and remands for re-sentencing.

A. The Facts

1.
Around 8:00 p.m. on a warm Thursday evening  September 11, 1986  21-year-old Willie Boyer ran into his friend, Krystal King, at the Biloxi Beach Arcade. They "hung out" at the arcade until around 9:30  at which time they decided to stroll down to the beach and drink a six-pack of beer. Hours passed; midnight arrived; and the beer ran out. Krystal asked Willie to drive her to a house, unfamiliar to him, located on Burton Avenue in Gulfport. "Jerry" Holland, the appellant in this case, owned this house.

2.
Jerry Holland had not lived in Gulfport all his life; he grew up in his birthplace, Los Angeles, with his mom, dad, two younger brothers, and a younger sister. His dad worked various jobs  as an electrician, truck mechanic, and other positions involving general maintenance. His mom was a homemaker.
During the latter half of his teen-aged years, Holland moved with his family to Memphis where he completed his high-school education and received a "certificate of credits." He left home at the age of twenty-one, and survived by working odd jobs. Holland explained: "[A]s I got older, I worked selling shoes, [became a] dental technician, and got into the electrical trade and stayed in it most of the time." He accumulated over twenty years' experience as an electrician  with some vocational training in this field. He "lived and worked in different places," married and divorced twice, fathered five children, and ran afoul of the law. His criminal record includes convictions for burglary, larceny (auto theft), and rape of a child. He received a four-year term in a Texas prison for the rape; however, he served only one year before being paroled in 1976. He moved to Gulfport in 1981. Five years later, his and Krystal's path crossed.
By that time, in June or July 1986, Holland's second wife had left him and taken their only child, Ina, with her. He was doing "contract work" on and off, and he had secured a roommate, 21-year-old Jerry Douglas, who introduced him to Krystal.

3.
On the night when Boyer drove Krystal to Burton Avenue, Holland had been drinking. This was not out of character for *852 Holland. He had, as of August 1, become a drinker of at least a "six-pack" of beer a day  which he attributed to his "despondence" over his then-pending divorce. Boyer "remember[s] seeing [Holland] have ... one [beer] the whole time [he] was there," and he "did not appear ... to be intoxicated or drunk." Boyer himself "had a little bit of tequila and a beer," and Krystal abstained completely. Meanwhile, Douglas and 19-year-old Carter Fugate, who had only recently moved in, slept soundly in their bedrooms; they had been in bed since 11:00 p.m.
Boyer and Krystal's visit lasted for a couple hours  during which time they watched "David Letterman" (a T.V. talk show) and listened to Holland small-talk about his divorce and the "divorce papers" which he had just received in the mail. Around 2:30 a.m., Boyer decided to leave, and Krystal remained behind. That was the last time Boyer saw her alive.

4.
Later in the night  between 3:20 and 3:30 a.m.  a "bump" awakened Douglas:
DOUGLAS: I got up to go to the bathroom and to get a drink of water. I opened my bedroom door, the lights in the house was on, the front door standing wide open.
... .
I heard another noise outside the front door... . [I] looked through the ... door and I saw [Holland] bent over a black object on the ground. I looked at him and asked him, "Jerry, what is going on?" And he looked back up at me and says, "Go back to bed you don't want to know."
Vol. IX, at 1401-02. Douglas then went into the kitchen and peered out the window: "I saw him roll[] this object into the back of his pick up truck and it made a loud thud sound when it hit the bed of the truck."
Holland returned to the house and, once inside, Douglas noticed that "he had a wild look on his face, his eyes were very big and glassy looking, and he was shaking." At that point, Holland confessed: "My God, I killed her [Krystal], I killed her." Id. at 1402. According to Douglas, Holland then explained that he and Krystal had had sex on the couch  after which she picked up his "razor-sharp" hunting knife located nearby and "started playing with it." Holland and Krystal "winded up going into his bedroom and she [continued to] play with the knife." Holland "took the knife from her and the next thing he knew it was in her chest." "[H]e had stabbed her."
Douglas noted that Holland changed his story a few minutes later: Holland told him that he and Krystal were "wrestling around on the bed and [she] rolled off the bed and she fell onto the knife." Holland also told him that "he mutilated the body to cover up the stab wounds" and to "make it look like a sex fiend had done it." And he explained that he had placed the body in his truck "to ... bury it and try and cover everything up."
Douglas, under duress, accompanied Holland to bury Krystal's body. Douglas later contacted the Gulfport Police Department and informed homicide detectives  including Wayne Payne and Glen Terrell  about the murder. Upon hearing Douglas' story, the detectives acquired arrest and search warrants.
At approximately 11:20 a.m. on September 12, 1986, a Gulfport Police Department S.W.A.T. Unit executed the warrants; the Unit entered Holland's home, arrested him, and read him his Miranda rights. Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 1629-30, 16 L.Ed.2d 694, 726 (1966). Detectives Payne and Terrell read Holland his rights three more times at the police station. Holland decided to waive them and confess.
HOLLAND: We had ... I think we had sex. I was pretty much drunk... . I don't even know if we did it or not and she was sitting in my lap and ... she saw my goddamned hunting knife. She started playing with it and she said let's go to bed, I'm sleepy. I said are you going to sleep on the couch or do you want to sleep with me? She says I'll sleep with you, so we went to the bedroom and she ... still had that goddamned knife in her hand. She was messing around with it like Zorro and all *853 that bullshit. Typical kid at that point, I mean.
... .
I was dodging [the knife] ... and I grabbed her wrist and I was going to take it away from her before one of us got hurt with it and then I bumped into her chest and she says I'm dead. Then things got kind of black there for a minute.
After confessing, Holland accompanied detectives to the burial site; they exhumed the body. An autopsy conducted by Dr. Paul McGarry revealed that Krystal had been brutally battered. McGarry described her injuries and their sequence.
The first injuries were of the face, over the sides of the face, over the center of the face, the lips, over the nose, the eyes, they were more swollen, they were the most advanced. About the same time frame, next in line, the injuries of the arms, forearms, wrists, knees, shins. In that same time pattern, the injuries to the genital region, the stretching and scraping and tearing of the vagina and rectal tissues... . These are produced by forceful penetration of the vagina and rectum by a structure that is able to distend and stretch and tear in a symmetrical pattern. In other words, a round  a roughly round structure penetrating and stretching the vagina and stretching the anus and rectum... . In order to produce these injuries all the [sic] around the edge, it has to be something not as firm and unyielding as a metal or wooden instrument. It has to be a part of a human body or something with that same texture consistency[ like a] male sex organ.
Next is the stab wound of the chest which went through the heart and through the aorta. Next after that is the ligature around the neck, the tying of the shirt tightly around the neck catching the hair in the shirt. Next is the blow to the back of the head which caught the hair that was in the ligature in that position and the last injury ... a pair of underpants ... was stuffed down the throat, down as far as the voice box... .
Vol. XII, at 2184-85. McGarry stated that Krystal probably remained conscious during the entire ordeal until, finally, "she died of asphyxiation because of the ligature placed around her neck which closed off her airway, and the stuffing of clothing down her throat that obstructed her wind-pipe." She probably did not die from the stab wound; indeed, she could have lived "as long as several hours" after being stabbed had she not been strangled. The stab wound did, however, contribute to her death. The mutilation of her genital area occurred post-mortem.

5.
On November 17, 1986, a grand jury returned an indictment against Holland for killing Krystal with "malice aforethought" while "engaged in the commission of the crime and felony of rape." See MISS. CODE ANN. § 97-3-19(2)(e) (1972). The Grand Jury later re-indicted him for the same crime but as an habitual offender. Id. § 99-19-83 (1990 Supp.).
On November 30, 1987  after numerous hearings on pre-trial motions  Judge Kosta N. Vlahos held trial at the Adams County Circuit Court.[1] Twelve days later, the trial concluded. The jury found Holland guilty as charged and sentenced him to death.

B. The Issues
Holland appealed and presented numerous issues for disposition. These issues are addressed in the next section.

II. ANALYSIS
Before embarking on the analysis, this Court is reminded of its "commitment to heightened scrutiny" in capital cases. "All doubts should be resolved in favor of the accused." See Jones v. State, 461 So.2d 686, 690 (Miss. 1984) ("We reaffirm at the outset our commitment to heightened scrutiny on appeal in cases where the sentence *854 of death has been imposed.") (discussing Furman v. Georgia, 408 U.S. 238, 306, 92 S.Ct. 2726, 3760, 33 L.Ed.2d 346, 388 (1972) (Stewart, J., concurring), and its progeny); Mackbee v. State, 575 So.2d 16, 23 (Miss. 1990) ("[I]n a capital murder case ... all doubts should be resolved in favor of the accused.") (quoting Mease v. State, 539 So.2d 1324, 1330 (Miss. 1989); Fairchild v. State, 459 So.2d 793, 801 (Miss. 1984); and Gambrell v. State, 92 Miss. 728, 736, 46 So. 138, 139 (1908)).

A. Pre-Trial Issue

1. Issue: Whether Holland's confession should have been excluded?[2]
Holland filed a motion to suppress his confession; he based his motion on the failure of Detectives Payne and Terrell to cease all custodial interrogation after he had allegedly invoked his right to an attorney. The trial judge held a lengthy suppression hearing and then issued an opinion in which he declared the confession admissible:
OPINION AND ORDER
On a former day a Motion to Suppress was heard. Present were the Defendant, Gerald James Holland; his attorneys, Earl Stegall and Lisa Dodson; and the District Attorney, Cono Caranna and his assistant, Margaret Alfonso. After hearing the evidence and arguments of the attorneys, cases were submitted to the Court and the motion was taken under advisement.
.....
The Defendant contends that the statements of the Defendant and resulting physical evidence are not admissible because the Defendant made a non-ambiguous request for an attorney prior to giving his taped statement. The more credible evidence does not support this contention. Although there was a conflict in the testimony concerning the issue of an attorney, the Court finds beyond a reasonable doubt that the Defendant did not ask for an attorney nor did he invoke his right to an attorney prior to giving his taped statement. The Defendant was mirandized orally and by writing. He then asked, "Don't you think I need a lawyer?" The officer responded by again advising the Defendant of his right to an attorney  his constitutional right to an attorney; and that, if he did not want to talk to them he did not have to; that there were two sides to every story, they had heard one side and they wanted to hear his side. The Defendant responded, "Ok" he would talk to them.
In Connecticut v. Barrett, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.[2d] 920 (1987), the United States Supreme Court was confronted with the admissibility of an oral confession. The Defendant, after being mirandized, had clearly stated that he would not make a written statement without an attorney, yet, he agreed to and did give them an oral confession. In reversing the Connecticut Supreme Court and holding that the oral confession was admissible, Justice Rehnquist in a 7/2 decision stated at page 927:
The fundamental purpose of the Court's decision in Miranda was "to assure that the individual right to choose between speech and silence remains unfettered throughout the interrogation process" .. . "Once warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities." (emphasis added)
Having been properly warned, the Defendant exercised his own volition and decided to make a statement to the authorities.
The proof further established beyond a reasonable doubt that the Defendant was *855 Mirandized, that he understood his rights, that he freely signed a waiver of his rights; that the Defendant freely, voluntarily, knowingly and intelligently waived his constitutional rights without any threats, promises or coercion by the officers.
Vol. I, at 75-77.
When validity of a confession is challenged on appeal, an initial inquiry must be conducted. This Court must determine whether the trial judge applied proper legal standards in his evaluation of facts. For example, the judge must have required the State to prove "all facts prerequisite to admissibility beyond a reasonable doubt." Jones, 461 So.2d at 697; Neal v. State, 451 So.2d 743, 753 (Miss. 1984); Stevens v. State, 228 So.2d 888, 889 (Miss. 1969); Dover v. State, 227 So.2d 296, 300 (Miss. 1969); Harvey v. State, 207 So.2d 108, 115 (Miss. 1968). If the judge applied the proper standards, then this Court must determine from a review of the entire record whether the fact-finding is supported by substantial evidence. Jones, 461 So.2d at 697; Neal, 451 So.2d at 753 (employing both "clearly-erroneous" and "substantial-evidence" standards of review); see Beckwith v. United States, 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1, 8 (1976) (review of record not limited to evidence before trial judge at suppression hearing). If the judge applied proper legal standards and his factfinding is supported by substantial evidence, then this Court may not disturb his decision to validate the confession. Jones, 461 So.2d at 697.

(a) Parties' Contentions
In the case sub judice, neither Holland nor the State disputes the trial judge's fact-finding. Accord Appellant's Brief at 27 ("[T]here is no factual dispute; the issue presented is essentially a legal question."). Indeed, no one seems to dispute the judge's citation of law. The dispute, in essence, is whether the judge reached the right conclusion after applying relevant law to the undisputed facts. Holland contends the judge should have concluded: (1) that his question  "Don't you think I need a lawyer?"  constituted an unambiguous request for an attorney and, therefore, the officers should have ceased interrogation; alternatively (2) that his question constituted an ambiguous request and, therefore, the officers should have ceased interrogation except for that intended to clarify. Holland adds that, because improper interrogation did not cease, his "subsequently-obtained confession should be deemed inadmissible." Appellant's Brief at 22-28. The State of course rejects Holland's contention and, basically, concurs in the trial judge's conclusion. Appellee's Brief at 17-21. Resolution of this dispute will entail an in-depth, step-by-step analysis of both evidence and relevant law.

(b) Step-By-Step Analysis of Relevant Law

(i) Step One: Was Holland's Question Ambiguous?
The first step will require a determination of whether Holland's question constituted an ambiguous invocation of his right to an attorney.
The constitutional principles governing custodial interrogation are well-established. One principle dictates that custodial interrogation must be preceded by advice to the putative defendant (hereinafter "defendant") regarding the Fifth Amendment rights to remain silent and to have an attorney present. Miranda, 384 U.S. at 479, 86 S.Ct. at 1639, 16 L.Ed.2d at 726. If the right to remain silent is invoked, "the interrogation must cease." If the right to have an attorney present is invoked, "the interrogation must cease until [one] is present." Id., quoted in Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1880, 68 L.Ed.2d 378, 386 (1981); see also Smith v. Illinois, 469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488, 493-94 (1984) (per curiam) (This is a "rigid prophylactic rule."). Under either circumstance, interrogation may commence or resume in the absence of an attorney if the defendant: (1) "initiated further discussions with the police"; and (2) "knowingly and intelligently [and voluntarily] waived the right ... invoked." Smith, 469 U.S. at 95, 105 S.Ct. at 492, 83 L.Ed.2d at 494; *856 United States v. Gotay, 844 F.2d 971, 976 (2d Cir.1988).
The right to have an attorney present must be "specifically invoked." Edwards, 451 U.S. at 482, 101 S.Ct. at 1884, 68 L.Ed.2d at 385. This may be accomplished "in any manner and at any stage of the process." Miranda, 384 U.S. at 444-45, 86 S.Ct. at 1612-13, 16 L.Ed.2d at 706-07. And courts must "give a broad, rather than a narrow, interpretation to a defendant's request for counsel," and this principle applies "whether the defendant's request is explicit or equivocal." Towne v. Dugger, 899 F.2d 1104, 1106 (11th Cir.1990) (quoting Michigan v. Jackson, 475 U.S. 625, 633, 106 S.Ct. 1404, 1406, 89 L.Ed.2d 631, 640 (1986)).
If a defendant makes equivocal or ambiguous utterances which could be interpreted as an invocation, then the trend is to require cessation of interrogation except for strictly-limited inquiry for clarification purposes. Gotay, 844 F.2d at 974 ("The trend ... is to adopt that when a suspect makes an equivocal statement that can arguably be construed as a request for counsel, interrogations must cease except for narrow questions designed to clarify the earlier statement and the suspect's desire for counsel."); see Towne, 899 F.2d at 1106; United States v. Porter, 776 F.2d 370 (1st Cir.1985), cert. denied, 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987); United States v. Cherry, 733 F.2d 1124, 1130-31 (5th Cir.1984), cert. denied, 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987); United States v. Fouche, 776 F.2d 1398, 1405 (9th Cir.1985).[3] This Court has joined the trend by permitting an interrogator to clarify ambiguous utterances. See, e.g., Kirkland v. State, 559 So.2d 1046, 1048 (Miss. 1990); Berry v. State, 575 So.2d 1, 5-8 (Miss. 1990).
"Precedents do not establish a bright line rule for determining what sorts of statements amount to equivocal requests for an attorney." Towne, 899 F.2d at 1106; see Robinson v. Borg, 918 F.2d 1387, 1391 n. 4 (9th Cir.1990) ("The totality of circumstances test, which is used to determine whether an accused has `knowingly and voluntarily' waived his Miranda rights, has no role in the determination of whether an accused's request for counsel is clear or equivocal.") (quoting Owen v. Alabama, 849 F.2d 536, 539 (11th Cir.1988)). This determination is critical, though, because incriminating information is inadmissible evidence if elicited after ambiguous utterances and prior to clarification. Gotay, 844 F.2d at 975; Fouche, 776 F.2d at 1405 (citing cases); Anderson v. Smith, 751 F.2d 96, 104 n. 9 (2d Cir.1984).
In the case sub judice, the trial judge found that Holland had asked the detectives: "Don't you think I need a lawyer?" The judge then applied the law to this fact-finding and seems to have concluded that Holland's question constituted a declination of his right to have an attorney present. This conclusion is inconsistent with case law.
As noted, precedents do not establish a bright-line rule for determining whether an utterance is ambiguous, and the United States Supreme Court has twice expressly declined to address the issue. Towne, 899 F.2d at 1106; see Connecticut v. Barrett, 479 U.S. 523, 529 n. 3, 107 S.Ct. 828, 832 n. 3, 93 L.Ed.2d 920, 928 n. 3 (1987); Smith, 469 U.S. at 96, 105 S.Ct. at 493, 83 L.Ed.2d at 494; see also Gotay, 844 F.2d at 974-75 ("The Supreme Court has not defined `ambiguity' in this context or ruled on the consequences thereof."). Precedents do, however, establish that questions such as the one posed by Holland are ambiguous and require clarification.
The recent case  Towne v. Dugger, 899 F.2d 1104 (11th Cir.1990)  is particularly instructive. In Towne, the Eleventh Circuit held that the defendant's question  "Officer, what do you think about whether I should get a lawyer?"  was ambiguous and required clarification. Id. at 1107-08 (citing cases in which an "interrogating *857 officer was asked by the defendant for advice on whether he should exercise his right to get an attorney"). The Court explained that "[s]uch questions reveal to the interrogating officer that the defendant is contemplating exercising his right to have an attorney present, and under [established case law], the officer should clarify the defendant's wishes before proceeding further." Id. at 1109 (citing cases); see Norman v. Ducharme, 871 F.2d 1483, 1486 (9th Cir.1989) (defendant's question  "[Do you think I] should see a lawyer?"  deemed ambiguous); U.S. v. Fouche, 833 F.2d 1284 at 1286-87 (9th Cir.1987) (defendant's question  "What should I do?"  deemed ambiguous).[4]
Questions like Holland's are not only to be characterized as ambiguous  not only as a matter of law  but also as a matter of definition. Accord Knight v. State ex rel. Moore, 574 So.2d 662, 668 (Miss. 1990) ("disposition of the issue ... require[s] comprehension of the `popular use of the word as shown by the dictionaries'") (quoting O.W. Holmes' opinion in Commonwealth v. Wright, 137 Mass. 250, 251-52 (1884)). Definitionally, a "question" is "[a]n expression of inquiry that invites or calls for a reply" or "a subject or point open to controversy [or] under discussion or being considered." THE AMERICAN HERITAGE DICTIONARY 1015 (2d ed. 1985). Conversely, a "declaration" is "[a]n explicit or formal statement or announcement"). Id. at 372. Thus, when a suspect poses a question, interrogators should be permitted to respond for purposes of clarification; this plain-English or common-sense approach is consistent with the sound law pronounced in Towne and numerous other cases.[5]See, e.g., Robinson v. Borg, 918 F.2d 1387, 1391 (9th Cir.1990) ("In analyzing a defendant's request for counsel, we take a defendant's words `understood as ordinary people would understand them.'") (quoting Barrett, 479 U.S. at 529, 107 S.Ct. at 832, 93 L.Ed.2d at 928).
In sum, Holland's question constituted an ambiguous invocation as a matter of law and as a matter of definition.[6] With the foregoing in mind, this Court must now determine whether the police detective responded to Holland's ambiguous invocation within constitutional parameters. That is, did the detective tailor his response solely for the purpose of clarifying the ambiguity?

ii. Step Two: Did the Detectives Clarify Holland's Question?
As discussed, an ambiguous utterance means that any subsequent interrogation *858 "must be limited to attempts to clarify and must not coerce or intimidate the suspect into waiving his rights." Fouche, 833 F.2d at 1287 (citing Nash v. Estelle, 597 F.2d 513, 517-18 (5th Cir.) (en banc), cert. denied, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979)); see Owen, 849 F.2d at 539 ("When a defendant makes an equivocal request for an attorney during a custodial interrogation, `the scope of the interrogation is immediately narrowed to one subject and one only. Further questioning thereafter must be limited to clarifying that request until it is clarified.'") (quoting Thompson v. Wainwright, 601 F.2d 768, 771 (5th Cir.1979) (emphasis omitted); Terry v. LeFevre, 862 F.2d 409, 412 (2d Cir.1988) ("`[W]hen a suspect makes an equivocal statement that arguably can be construed as a request for counsel, interrogation must cease except for narrow questions designed to clarify the earlier statement and the suspect's desire for counsel.'") (quoting Gotay, 844 F.2d at 975); accord United States v. Pena, 897 F.2d 1075, 1081-82 (11th Cir.1990) (discussing analogous law pertaining to ambiguous invocation of right to remain silent) (citing cases); Delap v. Dugger, 890 F.2d 285, 290 (11th Cir.1989) (same).
Of utmost import, an interrogator's "behavior" must not exceed the limits of permissible clarification. Courts have concluded that determining the propriety of such behavior is "essentially a factual issue" that requires "review under a clearly erroneous standard." See, e.g., Fouche, 833 F.2d at 1286; United States v. McConney, 728 F.2d 1195, 1200-02 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
The "critical factor" in determining the validity of the government's behavior is "whether a review of the whole event discloses that the interviewing agent has impinged on the exercise of the suspect's continuing option to cut off the interview."
Fouche, 833 F.2d at 1287 (quoting Nash, 597 F.2d at 518); see Butzin v. Wood, 886 F.2d 1016, 1018 (8th Cir.1989) ("An officer's attempt to seek clarification of an ambiguous statement is not generally construed as interrogation for Miranda purposes if the question does not `enhance the defendant's guilt or raise the offense to a higher degree.'") (quoting W. LAFAVE & J. ISRAEL, CRIMINAL PROCEDURE 514 (1984)); Christopher v. State of Florida, 824 F.2d 836, 842 (11th Cir.1987) (Clarification may not include "questions that, though clothed in the guise of `clarification,' are designed to, or operate to, delay, confuse or burden the suspect in his assertion of his rights.") (footnote omitted), cert. denied, 484 U.S. 1077, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988).
In the case sub judice, the trial judge did not reach the "clarification" issue because he found that Holland's question or utterance constituted an unambiguous waiver of rights. The judge did, however, make a relevant fact-finding with which Holland does not dispute:
The officer responded [to Holland's question] by again advising him of his right to an attorney  his constitutional right to an attorney; and that, if he did not want to talk to them he did not have to; that there were two sides to every story, they had heard one side and they wanted to hear his side. The Defendant responded, "Ok" he would talk to them.
Vol. I, at 75-77. Immediately following Holland's decision to waive his rights and "talk to them," the officers again advised Holland of his rights  which he again waived before confessing. Thus, the officers did not overreach or wander into un constitutional territory. They merely clarified Holland's ambiguous question by twice explaining his option to exercise his Miranda rights or to relate his "side of the story." The latter option prevailed; Holland decided he "would talk to them."[7]
*859 In sum, Detectives Payne and Terrell's response, which culminated in Holland's decision to waive his rights, did not exceed constitutional parameters. With the foregoing in mind, this Court must finally determine whether Holland knowingly, intelligently, and voluntarily waived his rights.

iii. Final Step: Did Holland validly waive his rights?
"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the [State]" to prove[8] the validity of a defendant's waiver of his "privilege against self-incrimination and his right to retained or appointed counsel." North Carolina v. Butler, 441 U.S. 369, 372-73, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 291-92 (1979) (quoting Miranda, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 706).
Specifically, Miranda requires proof that "the waiver [was] made voluntarily, knowingly and intelligently." 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 707, quoted in Nash, 597 F.2d at 518; see Edwards, 451 U.S. at 482, 101 S.Ct. at 1884, 68 L.Ed.2d at 385 ("[W]aivers of counsel must not only be voluntary, but also must constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege."); Gotay, 844 F.2d at 976 (same) (citing Smith, 469 U.S. at 95, 105 S.Ct. at 492-93, 83 L.Ed.2d at 1494).
In short, "[a] waiver is voluntary if it is `the product of a free and deliberate choice rather than intimidation, coercion or deception.'" Moreover, "[a] waiver is knowing and intelligent if it is `made with a full *860 awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" Grooms v. Keeney, 826 F.2d 883, 887 (9th Cir.1987) (quoting and citing cases) (emphasis added).
In the case sub judice, the trial judge concluded that the State met its burden  i.e., Holland voluntarily, knowingly, and intelligently waived his rights. Whether this conclusion is correct is a mixed issue of law and fact. Norman, 871 F.2d at 1486; Terrovona v. Kincheloe, 852 F.2d 424, 428 (9th Cir.1988). In other words: (1) if the judge based his finding upon appropriate principles of law; (2) and the finding is supported by the facts (i.e., by substantial evidence); (3) then this Court may not reverse. Schmitt v. State, 560 So.2d 148, 151 (Miss. 1990); cf. State v. Whitaker, 578 A.2d 1031, 1039 (Conn. 1990) ("Where the trial court makes specific factual findings regarding [this issue], those findings are entitled to deference so long as they are supported by substantial evidence, but where, as here, the trial court has made no specific findings, we must review the evidence and make our own determination of the circumstances surrounding the defendant's waiver of his constitutional rights").
Perusal of the judge's written "OPINION AND ORDER" reveals that the correct principles of law were applied. Whether the judge's finding is supported by substantial evidence is another matter. To resolve this question, this Court must conduct an independent review of the entire record. See Edwards, 451 U.S. at 482, 101 S.Ct. at 1884, 68 L.Ed.2d at 385 (review should focus on the "particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused") (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938)); Whitaker, 578 A.2d at 1039 (review should focus on defendant's "experience with the police and familiarity with warnings; intelligence, including I.Q.; age; education; vocabulary and ability to read and write in the language in which the warnings were given; intoxication; emotional state; mental disease, disorder or retardation").
First, the evidence gleaned from the record which arguably discredits the judge's fact-finding is summarized:
1. Holland had been drinking up until his arrest. See State v. Williams, 208 So.2d 172, 175 (Miss. 1968) (holding that, if defendant was in "an acute, rampant state of intoxication equivalent to mania," a waiver cannot be considered valid).
2. Holland had not slept for nearly 24 hours prior to waiving his rights. See Greenwald v. Wisconsin, 390 U.S. 519, 520-21, 88 S.Ct. 1152, 1153-54, 20 L.Ed.2d 77, 79-80 (1968) (Court considered lack of sleep a factor in its determination that confession not "the product of his free and rational choice"); Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) (same); Neal, 451 So.2d at 756 (where this Court deemed significant the "evidence at the suppression hearing [which] reflect[ed] that Neal was fresh on the afternoon ... when he gave his confession" (emphasis added)).
3. Holland's periodic bouts of crying may be reflective of emotional instability, which could have impaired his ability to knowingly, intelligently, and voluntarily waive his rights. This point is not raised by Holland; nonetheless, it is relevant to the analysis of the validity of the waiver. Compare State v. Williams, 208 So.2d 172, 175 (Miss. 1968) (where this Court deemed the waiver invalid in view of the defendant's "mental imbalance" and "maniacal" behavior), with Kniep v. State, 525 So.2d 385, 389 (Miss. 1988) (where this Court considered, but rejected without comment, defendant's claim that she was so "emotionally distraught" and in such a "confused mental state" that her ability to "intelligently" waive her rights was impaired.); see also Whitaker, 578 A.2d at 1039 (emotional state deemed relevant).
The following is a summary of the evidence which supports the conclusion that Holland did have the requisite state of *861 mind  despite his drinking and lack of sleep:
1. Holland repeatedly acknowledged that he understood his Miranda rights; he expressed this acknowledgement both orally and in writing (by signing the form). See Butler, 441 U.S. at 372-73, 99 S.Ct. at 1757, 60 L.Ed.2d at 291-92 ("An express written or oral statement of waiver of the right . .. is usually strong proof of the validity of the waiver." (emphasis added)); see also Neal, 451 So.2d at 753 ("[T]he mere giving of the Miranda warnings, no matter how meticulous, no matter how often repeated, does not [automatically] render admissible any inculpatory statement thereafter given by the accused.").
2. He was 49 years old, has a high school and vocational education, and considers himself to be a "very intelligent person." See Coleman v. State, 378 So.2d 640, 644 (Miss. 1979) (Upon noting that "[a]ge and intelligence level are factors to be considered," the Court concluded that a 16-year-old with a fourth-grade education could properly waive his rights.); Jones, 461 So.2d at 696 (educational background considered as a factor) (citing cases); cf. Williamson v. State, 330 So.2d 272, 276 (Miss. 1976) ("[T]he will of a person who is of weak intellect may be more easily overcome than that of one who is more intelligent.").
3. His criminal past provides him with some experience and knowledge about a suspect's Miranda rights. See Hovland v. Blodgett, 914 F.2d 262 (9th Cir.1990) WESTLAW, "Allfeds" database) (defendant's "past experience with the judicial system" factored into the court's decision that he "knew how to request counsel" and "knowingly waived his Miranda rights").
4. Holland's intoxication nor lack of sleep impaired his ability to knowingly, intelligently, and voluntarily waive his rights:

Five witnesses testified that Holland did not appear to be impaired by alcohol and did not slur his speech.[9]See Kniep, 525 So.2d at 389 (Rejecting the defendant's claim that intoxication (and other specified factors) affected the voluntariness of her waiver, this Court cited the testimony of one witness who "noticed an odor of alcohol on [the defendant's] breath" but felt the defendant "appeared to know what she was doing and what she was talking about."); Stevens, 458 So.2d at 728-29 (same); see also United States v. D'Antoni, 856 F.2d 975, 981 (7th Cir.1988) ("The defendant had been drinking and smoking marijuana during the past twenty-four hours... . The defendant himself, however, testified that he had had no alcohol in the five or six hours prior to the interview, and that he understood the detectives' questions... . We agree ... that the defendant's statements to the detectives were made voluntarily.").

Holland testified that he had been a chronic drinker. See Stevens v. State, 458 So.2d 726, 728 (Miss. 1984) (Rejecting the defendant's claim that his blood alcohol content of .16 "prevented" a proper waiver, this Court cited an expert's opinion that "chronic drinking" increases the body's ability to "degrade alcohol in the blood.").

Periodic bouts of crying aside, Holland was calm and cooperative "at all phases of the investigation"  particularly at the moment when he waived his rights. See, e.g., Appellant's Brief at 3. This is an important point since this Court once held that a defendant's waiver could not have been made "rationally, voluntarily and intentionally" because the evidence evinces "an acute, rampant state of intoxication equivalent to mania" and a "deranged and psychotic mental imbalance." Williams, 208 So.2d at 175. Holland's meticulous post-murder scheming aimed at "covering his tracks" to avoid arrest reflects a coherent, unimpaired state of mind. See generally Sections I(A)(4) & (5) of this opinion, supra; see also Vol. XIV, at 2489-90 (Holland's testimony).

*862 5. Holland's lack of sleep did not impair his ability to waive his rights in view of the facts. Accord D'Antoni, 856 F.2d at 981 (defendant's lack of sleep for 24 hours preceding interrogation did not render waiver invalid  particularly since the defendant testified that he understood the detectives' questions and the interrogation was not "lengthy or arduous [i.e., 30 minutes]").
6. Holland's evidence of coercion or involuntariness is either unsubstantiated[10]or insufficient[11]and is contradicted by his taped confession containing the admission that no one has "threatened," "intimidated," or "promised [him] anything." State's Exhs. 8 & 56.
Based upon the "particular facts and circumstances surrounding [this] case, including the background, experience, and conduct of the accused," this Court affirms the trial judge's finding that Holland knowingly, intelligently, and voluntarily waived his rights. Zerbst, 304 U.S. at 464, 58 S.Ct. at 1023, 82 L.Ed. at 1466.

(c) Disposition
In view of the foregoing, this Court concludes: (1) Holland's utterance about exercising his right to have an attorney present was ambiguous; (2) the detectives properly clarified the ambiguity; (3) Holland knowingly, intelligently, and voluntarily waived his rights; (4) Therefore, the trial judge properly admitted the confession.

B. Guilt-Phase Issues

1. Issue: Whether the Trial Judge's Restriction of Holland's Attempted Impeachment of a Witness and Cross-Examination of Another Witness Violated His Constitutional Rights?
This issue involves three alleged errors; they are addressed individually.

(a) First Alleged Error
During cross-examination of Douglas, Holland asked: "Did you [Douglas] ever tell [Lester Thompson, a polygrapher] that it was on [his] mind to have sex with Krystal?" Douglas emphatically and repeatedly said, "No." For impeachment purposes, Holland requested that he be allowed to call to the stand Lester Thompson, who allegedly would testify that Douglas had once told him that he "thought it would be nice to have sex with Krystal." The State objected on the basis of irrelevancy, and the trial judge after much debate denied Holland's request. See generally Vol. IX, at 1503-13; Vol. XIII, at 2265-70. Holland now questions this denial.
This Court has held that "in laying the predicate to introduce prior inconsistent statements ... the statement made in court [must be] relevant to the issue in the case and therefore not collateral." Carlisle v. State, 348 So.2d 765, 766 (Miss. 1977) (citing cases); accord Harrison v. State, 534 So.2d 175, 178 (Miss. 1988). Clearly, Douglas' alleged sexual fantasies about Krystal have no relevance to the issue of whether Holland raped Krystal.
In sum, Holland was on trial  not Douglas. The testimony which Holland attempted to elicit was irrelevant to proving or disproving guilt and, therefore, the judge properly sustained the State's objection.

(b) Second Alleged Error
Later in the trial, Holland asked Boyer during cross-examination whether Krystal and her former boyfriend, Bryan Anderson, had "had sexual relations ... on a regular basis." The State objected on the basis of *863 Miss.R.Evid. 412. Under Rule 412, "evidence of the past sexual behavior of an alleged victim is not admissible" in a criminal case "in which a person is accused of a sexual assault." The trial judge sustained the objection. Holland now questions this decision. Vol. X at 1608-09.
Holland contends that Rule 412 has nothing to do with relevancy because it was "designed [solely] to protect the privacy of a [living] victim"  not a dead victim like Krystal. Appellant's Brief at 53-54 (citing Rule 412's comment (a)). Common sense dictates that Holland's contention is meritless. At the very least, Holland needs to look at the title of the rule: "Sex Offense Cases; Relevance of Victim's Past Behavior."
Holland does nonetheless contend that the testimony about Krystal's past sexual behavior is relevant: "Anderson certainly could have had sex with [Krystal] before Boyer saw her at the arcade" on the night of the murder. Id. at 54. Maybe so. But as the State aptly notes, Holland is merely "grasping at straws." Appellee's Brief at 39. Whether Krystal and a former boyfriend regularly engaged in sexual relations is a frivolous inquiry having no relevance to the issue of Holland's guilt. See MISS.R.EVID. 401-03.
In sum, the judge properly sustained the State's objection to Holland's question about Krystal's past sexual behavior.

(c) Third Alleged Error
Finally, Holland asked Boyer to testify about a wager which Anderson allegedly made with a friend known as "Louie." Anderson allegedly bet that he would "sleep" with Krystal before Louie would "sleep" with a girl known as "Deedee." Holland asked this question because he again wanted to raise the possibility that Anderson (and not Holland) may have had sex with Krystal on the night of the murder. The State objected. The judge sustained the objection after characterizing the testimony which Holland attempted to elicit as inadmissible hearsay. Vol. X, at 1610-14.
Whether the testimony would constitute inadmissible hearsay is an issue which this Court need not address. The judge's decision is affirmed on the bases discussed in the preceding sections. In other words, the testimony would have been irrelevant pursuant to Rule 401 and common sense.

2. Issue: Whether a Videotape and Wash Cloth Were Too Prejudicial to Admit into Evidence?
The State proposed to introduce into evidence a videotape of the exhumation of Krystal's body from the site where Holland buried it and a foul-smelling wash cloth which the police found near the burial site.

(a) The Videotape

i. Parties' Contentions
The video shows: (1) the road leading to the burial site, (2) the area surrounding the site, and (3) the exhumation. Holland challenges the introduction of the video because "it doesn't tend to prove [his] guilt ... in any way," and it "would tend to inflame the jury because of the gruesome nature of the film." Holland adds: "There is nothing there that could not or has not been testified to and has not been supported by still photo[s]." (Photos of the grave site were admitted into evidence.) In sum, Holland contends that "any probative value the video might have would be outweighed by the prejudicial effect." Id. at 1694; see also Appellant's Brief at 48.
At trial, the State countered that the video's admissibility was necessary: (1) to show the landscape of the burial site about which two witnesses had testified; (2) to show that Krystal's body was wrapped in a sheet which was similar to Holland's bed linen; and (3) to show more than that which the still photos show. Vol. X, at 1699-1700 & 1723. And on appeal, the State provides several more reasons for admitting the video: (1) it "depicted the scene where the body was found and those matters found along side the body," (2) it shows the "physical condition of the burial scene and the ability of a truck to turn in that area," (3) it "added to the jury's understanding of what occurred at the site and completed the prosecution's picture of the *864 events of those early morning hours," (4) it "corroborate[d] the condition of the body of the victim and the testimony of the officers who unearthed the body," and (5) it "tie[d] evidence found at the grave site to evidence found at appellant's home." Appellant's Brief at 35.
The trial judge allowed the State to introduce the video but on the condition that the audio be turned "off." He ordered the elimination of audio to prevent the jury from hearing prejudicial comments which may have been made during the taping. Vol. X, at 1725.

ii. Relevant Law
Both parties support their contentions regarding admissibility of the "gruesome" video by citing analogous law governing admissibility of "gruesome, inflammatory photos." See Appellant's Brief at 49-50; Appellee's Brief at 34. In Williams v. State, Justice Sullivan summarized this law:
[G]enerally, the admissibility of photo[s] is within the sound discretion of the trial judge and the admission is proper, so long as their introduction serves some useful evidentiary purpose... .
[Accordingly, w]e have repeatedly admitted photo[s] of every description with the explanation that some "probative value" is present... . Abuse of discretion is sometimes explained to be admission of photo[s] when a killing is not contradicted or denied or the corpus delicti and the identity of the deceased have been established... .
A review of our case law indicates that the discretion of the trial judge runs toward almost unlimited admissibility regardless of gruesomeness, repetitiveness, and the extenuation of probative value. At this point ..., no meaningful limits exist in these so-called balance of probative/prejudicial effect of photo[s] test.
544 So.2d 782, 785 (Miss. 1987) (citations omitted). A few years later, this Court finally established a line of demarcation. In McNeal v. State, gruesome photos depicting a maggot-infested body were deemed devoid of "any evidentiary purpose." The Court held: "[W]e believe that the probative value of the photos is outweighed by their tendency to inflame and prejudice the jury"; therefore, "the trial [judge] abused [his] discretion ... in allowing the[ir] introduction." 551 So.2d 151, 159 (Miss. 1989) (citing MISS.R.EVID. 403[12]). At that point, the Court delineated a guideline for future cases: When deciding on the admissibility of gruesome photos, trial judges must consider: "(1) whether the proof is absolute or in doubt as to identity of the guilty party, [and] (2) whether the photos are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury." Id.

iii. Disposition
This Court must decide whether the probative value, if any, of admitting the video outweighed any prejudicial effect. In other words, did the trial judge abuse his discretion by admitting the video?
As discussed, the State contended that the video should be deemed admissible for various reasons. In short, the State explains that the video reveals more than that which is revealed through the photographic evidence and that the video provides substantiation for several witnesses' testimony regarding the burial site.
The State's contention, which lacks specificity, is unpersuasive. The video does not reveal more than that which is revealed through the photos; indeed, this Court holds the video was of no probative value to the State's case. This does not mean, however, that the video was prejudicial or inadmissible. In view of the video's content as well as all the horrific and overwhelming evidence presented in this case, this Court holds that the video was not prejudicial.
*865 In sum, the video should not have been admitted "on grounds of repetition, redundancy and cumulativeness." Hansen v. State, No. 87-DP-0823, slip op. at 49, 1991 WL 280025, [*]29 (Miss. December 18, 1991). However, in view of a lack of prejudicial effect, the video's erroneous admission does not warrant reversal. Id.

(b) The Wash Cloth
Holland objected to the introduction of a white wash cloth "not only because of its appearance, but because of the ... odor coming from the article." Holland explains that "the odor is so strong and pungent that it would [`adversely'] effect [sic] the jury"; that is, "it's probative value outweighs the prejudicial effect."
The State countered by simply stating that: "[It's an item] found in the grave site with the victim [and is p]robative for many reasons, including just the fact that it is another item found in her grave site."
The trial judge admitted the cloth after concurring in the State's rationale.
The law relevant to admissibility of the video is also relevant to the disposition of whether the wash cloth should have been admitted. In other words, this Court must determine whether the trial judge abused his discretion in deciding that the probative value, if any, of the smelly, stained cloth outweighed its tendency, if any, to inflame and prejudice the jury. The State contends that it was probative "for many reasons"; the State declares that it was found at the grave site. The cloth would have been relevant had it been identified as belonging to Holland or as deriving from Holland's home. Absent a sufficient connection between the cloth and Holland and/or the crime, the judge should have excluded it. To conclude otherwise would mean admitting anything found at the scene of a crime  notwithstanding its irrelevance. All this aside, this Court deems the error harmless in view of the overwhelming evidence presented in this case. Moreover, any prejudicial effect of admitting the cloth dims in view of the numerous items found at the grave site which were admitted without challenge. These items include "a sample of soil that covered the victim in the grave site," a pair of white corduroy shorts, a pair of panties, a black towel, a bag of concrete, a woman's black purse, a pair of white rubber gloves, a brown towel, a lace bra, white shoes, notes from a note-pad, and make-up. The State also introduced a bloody pillow case, which police investigators found at the grave site; Holland challenged the admissibility of this item on the ground that it contained an excessive amount of blood stain.[13] The trial judge overruled the objection, and Holland did not challenge this decision on appeal.
In sum, this Court concludes that admitting the cloth constituted an erroneous, albeit harmless, decision.

3. Issue: Whether the State Failed to Comply With Discovery?

(a) Parties' Contentions
Prior to trial, Holland filed a Rule 4.06 motion requesting disclosure of:
The name, address and qualifications of any expert witness intended to be called by the State. The substances of their testimony and the facts that [sic] relies upon in support of same are also requested.
Vol. I, at 42. Judge Vincent Sherry granted the motion. Id. at 53.
In response, the State provided Holland with various documents: (1) a letter from Dr. Paul McGarry to the State discussing his opinion about instruments which could have caused Krystal's injuries; (2) a letter from the State informing Holland of its intention to "seek[] the opinion of Dr. Paul McGarry as to the percentage of alleged rape cases wherein seminal fluid or spermatozoa are not present"; (3) a copy of McGarry's "Curriculum Vitae"; and (4) an autopsy report prepared by Dr. Paul McGarry.
*866 At trial, the State called McGarry to testify about the autopsy he performed on Krystal. At one point, after testifying about Krystal's injuries and bruises, the State asked McGarry:
Doctor, do you have an opinion about the amount of time it would take for such bruising to form?
Vol. XII, at 2058; see also id. at 2186-87 (further related questioning). Holland objected to this question on the ground that:
the ["substance" of the] doctor's opinions as to the time when [Krystal's] bruises began to form, which would lead to the doctor's opinions as to the time when the injuries must have been inflicted, were never disclosed [during] discovery.[14]
Holland contended that the State had known about McGarry's opinion regarding "time" (and "sequence") of bruises and injuries for at least a week prior to trial, and that its failure to disclose this information constituted "trial by ambush." Holland consequently moved for a mistrial or exclusion of such testimony. Id. at 2059-60 & 2065.
The State did not deny that it had "known about McGarry's opinion"; however, the State contended that McGarry's opinion is based on facts discoverable in the autopsy report  a copy of which Holland was provided.
After extensively debating this issue outside the jury's presence, the judge halted the trial and granted Holland an "unlimited opportunity" to interview McGarry. The interview transpired overnight. Vol. XII, at 2059-88.
The next morning, after the interview, the debate continued. The judge ultimately overruled Holland's motion  after which the following exchange transpired:
JUDGE VLAHOS: You will agree for the motion for mistrial or exclude the evidence, that on yesterday evening you were given ample opportunity to interview with Dr. McGarry... . [Y]ou visited with him for about ten or fifteen minutes; is that correct?
HOLLAND: That is correct. We did have an opportunity to talk with him.
JUDGE: And an unlimited opportunity; is that correct?
HOLLAND: Yes.
Id. at 2095-98.
In this appeal, Holland challenges the judge's decision to overrule his motion.

(b) Relevant Law and Disposition

(i)
When confronted with an alleged Rule 4.06 violation, this Court must review the record to determine whether the judge followed the guideline enunciated in Box v. State, 437 So.2d 19, 22-26 (Miss. 1983) (Robertson, J., specially concurring) (now codified in Rule 4.06(i)):
1. Upon defense objection, the trial court should give the defendant a reasonable opportunity to become familiar with the undisclosed evidence by interviewing the witness, inspecting the physical evidence, etc.
2. If, after this opportunity for familiarization, the defendant believes he may be prejudiced by lack of opportunity to prepare to meet the evidence, he must request a continuance. Failure to do so constitutes a waiver of the issue.
3. If the defendant does request a continuance the State may choose to proceed with trial and forego using the undisclosed evidence. If the State is not willing to proceed without the evidence, the trial court must grant the requested continuance.
Quoted in Cole v. State, 525 So.2d 365, 367-68 (Miss. 1987), and Kelly v. State, 553 So.2d 517, 520 (Miss. 1989).[15] Rule 4.06 and *867 the Box guideline are designed to avoid "ambush" or unfair surprise to either party at trial. Harris v. State, 446 So.2d 585, 589 (Miss. 1984); Ford v. State, 444 So.2d 841, 843 (Miss. 1984).
The question presented here brings into direct conflict two important interests. First there is prosecution's interest in presenting to the jury all relevant, probative evidence. On the other hand, there is the accused's interest in knowing reasonably well in advance of trial what the prosecution will try to prove and how it will attempt to make its proof which, of course, includes the names of persons the state expects to call as witnesses.
This state is committed to the proposition that these conflicting interests are best accommodated and that justice is more nearly achieved when, well in advance of trial, each side has reasonable access to the evidence of the other. See Rule 4.06 supra; Rules 26-37, Miss. R.Civ.P.
Box, 437 So.2d at 21.
Of critical import, remedies available for a discovery violation are not self-executing. Middlebrook v. State, 555 So.2d 1009, 1011 (Miss. 1990) (citing cases).

(ii)
Applying the law to facts, this Court concludes that Holland's contention is devoid of merit. The State provided Holland with McGarry's autopsy report and disclosed that McGarry would be called to testify. This should have sufficed to place Holland on notice of potential line of questioning by the State. Indeed, in the section of the report entitled "Provisional Autopsy Diagnosis," McGarry revealed his opinion on the general "time" of injuries (i.e., "Recently stretched lacerated abraded vaginal orifice, recently stretched abraded anus [and r]ecent mutilating cuts of the genital region, postmortem"). Notably, Holland conceded during the hearing on his motion that the autopsy report "does mention" a "time element." Vol. XII, at 2087-88. It would seem to go without saying that the State might delve into this matter at trial and ask McGarry to expound upon this "time element" in a more specific manner. Albeit Holland was not duty-bound to interview or interrogate McGarry prior to trial, his failure to do so is somewhat surprising  particularly in view of the fact that a pathologist's testimony in a case like this one would be critical to the State's case and detrimental to the defense's. Cf. Whittington v. State, 523 So.2d 966, 976 (Miss. 1988) ("defense was given complete access" prior to trial to Dr. McCormick, the pathologist who performed an autopsy on the victim). In sum, Holland seems to have expected too much from the State. Accord Moore v. Illinois, 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972) ("We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all ... investigatory work on a case.").
This Court's rejection of Holland's contention is also based, in part, on his failure to take advantage of the trial judge's willingness to provide him with an "unlimited opportunity" to interview McGarry. That is, the judge had complied with the Box guideline by granting Holland a reasonable opportunity to interview the witness and to familiarize himself with the evidence. But the record indicates that Holland declined to interview McGarry about his opinions.[16] An interview or examination might have lent credence to Holland's claim upon which he based his motion; it might have yielded information supportive of his own case; or it might have led him to conclude that McGarry's testimony would not be *868 prejudicial as originally thought. Holland's failure "flies in the face" of the Box guideline. Holland chose not to exercise this opportunity for reasons not made known and, thus, he rendered himself less informed or uninformed about what he was and is now claiming. This Court therefore holds him to that choice.
Finally, the record reveals that Holland waited too long before raising an objection. On the seventh day of trial between 3:27 and 4:10 p.m., the State announced its intention to question McGarry about the "time" and "sequence" when Krystal's injuries occurred: "Judge, we are going to have in evidence from Dr. McGarry as to when, in his opinion as a forensic pathologist, these wounds occurred."[17] Holland did not raise an objection until the eighth day of trial at approximately 5:07 p.m. when the State fulfilled its intention and asked McGarry the question. Vol. XII, at 2058-59. Thus, Holland's failure to raise an objection when he first learned of the State's intention is deemed a waiver.
In sum, this Court affirms on this issue.[18]

4. Issue: Whether the State's Delay in Providing Holland with the Rape Kit Violated His Constitutional Rights?
In this case, investigators employed a so-called "sexual assault kit" to collect samples of Krystal's body fluids. Holland filed a motion requesting preservation of these samples for future testing by his expert. The trial judge granted Holland's request and ordered the State's expert, Larry Turner, to use no more than half the samples in his testing and to preserve the remaining half for testing by Holland's forensic expert.
Turner complied with the judge's order and conducted various serological tests. The testing revealed the presence of acid phosphate, an enzyme which is a strong indicator of the presence of semen. About a year later, Holland received the samples after his proposed expert, Dr. Dennis Canfield, was adjudged qualified to conduct the testing. Canfield's testing revealed the presence of no acid phosphate  a result which contradicts Turner's test results.
Holland then filed a "Motion to Dismiss" contending that he was prejudiced because his receipt of the samples was untimely  untimely because he did not receive them until almost one year after Turner conducted his testing. This, he says, resulted in a "degradation" of the samples which left him unable to accurately and conclusively test them for the presence of semen. For support, he cites the inconsistent test results reached by Turner and Canfield. Holland conceded that he believed neither the State nor Turner is guilty of any misconduct.
Upon completion of a lengthy hearing, the judge overruled Holland's motion, and Holland appealed. Id. at 2153.

(a) Parties' Contentions
In this appeal, Holland contends: "It is unconscionable that the State's delay in producing th[e samples] result [sic] in such a gross prejudice to [his] ability to examine and test this evidence  a prejudice that was all too obvious during the cross-examination of [his] expert [Canfield]." Appellant's Brief at 44-45. Holland adds: "[D]ue process requires that a criminal defendant have access to physical evidence for independent testing." Id. at 43.
*869 The State counters that Holland's contention is unequivocally contrary to dispositive constitutional law  i.e., his due process rights were not violated. Appellee's Brief at 29-32.

(b) Relevant Law and Disposition
The record is simply devoid of any evidence to substantiate Holland's contention that his untimely receipt of the samples was due to the State's employment of "dilatory tactics" which resulted in a prejudicial degradation of potentially-exculpatory evidence. The record reveals the State fully complied with the judge's order to preserve half the samples. Indeed, Holland conceded during the hearing: "We are not saying there was any misconduct certainly by Mr. Turner or by the State." Vol. XII, at 2114. And Holland's own expert, Canfield, disputes his degradation theory. Id. at 2130-31. Any delay in receiving the samples was due to (1) Holland's inaction  i.e., his failure to simply go and get the samples from Turner who had properly preserved and stored them for him and (2) his mistaken belief that Turner had used up all the samples. Id. at 2114-16.
Because the record reveals no evidence of bad faith on the part of the State, no constitutional violation has been committed. See Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); United States v. Marion, 404 U.S. 307, 325, 92 S.Ct. 455, 466, 30 L.Ed.2d 468, 481 (1971) (no constitutional violation committed because "there is no showing that the Government intentionally delayed to gain some tactical advantage"); see Knapp, Prosecution's Failure to Preserve Potentially Exculpatory Evidence As Violating Criminal Defendant's Due Process Rights Under Federal Constitution  Supreme Court Cases, 102 L.Ed.2d 1041 (1989).
In sum, this Court affirms on this issue.

5. Issue: Whether a Manslaughter Instruction Was Warranted?
The trial judge granted Holland's instruction on the lesser-included offense of murder. Vol. I, at 143. But he refused Holland's three manslaughter instructions. Id. at 153-56; Vol. XIII, at 2310-12. These instructions refer to Miss. Code Ann. § 97-3-47 (1972): "Every other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title, shall be manslaughter."

(a) Parties' Contentions
Holland contends that his instructions should have been granted because a legally-sufficient evidentiary basis existed. He contends that a "manslaughter instruction was tantamount to resolving the conflict" between his theory that Krystal's death was accidental and the State's theory that Krystal's death could not have been accidental. Appellant's Brief at 37-40.
The State counters that, in view of the evidence, it "cannot agree that a jury could have ever found that Holland did not intend to murder Krystal." The State contends that the "least crime that [Holland] could have been found guilty of ... is that of murder"  on which the trial judge instructed. Appellee's Brief at 26-29.

(b) Relevant Law
Mississippi law on granting instructions on lesser-included offenses is clear. Trial judges "should be mindful of the disparity in maximum punishments" which may be imposed upon conviction of the principal offense or upon the lesser[-included] offense. Boyd v. State, 557 So.2d 1178, 1181 (Miss. 1989). As a general rule, "where the disparity is great this Court has required lesser included instructions to be given." Id. (citing Griffin v. State, 533 So.2d 444, 447 (Miss. 1988)). This general rule is tempered somewhat; trial judges "cannot indiscriminately give a lesser included offense instruction." Mackbee v. State, 575 So.2d 16, 22 (Miss. 1990) (citing Boyd, 557 So.2d at 1181).
Basically, a lesser-included-offense instruction should be granted if, in view of the evidence, a reasonable juror "`could find the defendant not guilty of the principal offense charged in the indictment yet guilty of the lesser included offense.'" Mease v. State, 539 So.2d 1324, 1330 (Miss. *870 1989) (quoting Monroe v. State, 515 So.2d 860, 863 (Miss. 1987)); see Stringer v. Jackson, 862 F.2d 1108, 1115 (5th Cir.1988) (rejecting Stringer's "new complaint" that the trial judge "erred in failing to instruct on the lesser included offense of non-capital murder or manslaughter," the Fifth Circuit held that he "introduced no evidence on which the jury rationally could have found him guilty of a lesser offense and acquitted him of the greater offense"); Swanier v. State, 473 So.2d 180, 188 (Miss. 1985) ("where the evidence does not warrant a manslaughter instruction, one should not be given"); Fairckild v. State, 459 So.2d 793, 799-802 (Miss. 1984) (defendant entitled to "simple" murder instruction, but not to manslaughter instruction). Conversely, "[o]nly where the evidence could only justify a conviction of the principal charge should a lesser[-included] offense instruction be refused." Mease, 539 So.2d at 1330.
In sum, "a lesser included offense instruction must be granted where a reasonable juror could not on the evidence exclude the lesser-included offense beyond a reasonable doubt." Boyd, 557 So.2d at 1182 (citation omitted).

(c) Disposition
Holland contends that the record contains evidence that the injuries Krystal sustained were the consequence of an unfortunate accident. For support, Holland cites statements he had made about an accidental stabbing to his roommate, Douglas, and to detectives during his taped confession. Holland believes that these statements warranted a manslaughter instruction. Holland is mistaken.
The statements he had made to Douglas were not even consistent:
DOUGLAS: [He] gave me two different stories ... about what happened.
Q.: You said it was about five minutes between [his telling you] the first story and ... the second . ..?
Douglas: Right.
... .
[According to the first story, h]e said that they [were in the bedroom and] she was playing around with a knife and that she accidentally scratched him across his belly or chest ... with the tip of the knife.
... .
He said that he went to take the knife away from her and some how it wound up in her chest.
... .
[According to the second story,] they were wrestling around on the bed, playing around, and she rolled off the bed and fell onto the knife.
Vol. IX, at 1543-51; State's Exh. 1, at 4. During his taped confession, Holland related yet another story: "I grabbed [Krystal's] wrist and I was going to take [the knife] away from her ... and I bumped into her chest and she says `I'm dead.'" State's Exh. 8, at 3.
Clearly, these inconsistent statements do not constitute a "legally sufficient evidentiary predicate for a Section 97-3-[47] manslaughter instruction." Mease, 539 So.2d at 1324. Conversely, the State successfully repudiated Holland's "accident" theory. Of all the evidence discoverable in the record the most damaging derives from the unrebutted testimony of McGarry, whose autopsy revealed that the stab wound could not have been inflicted under any one of the inconsistent scenarios related by Holland to Douglas and the detectives.
McGARRY: [T]he wound produced in Krystal King's body was one [caused] by a violent thrust of the knife against ... her chest with enough violence to indent the front of her chest. This would not happen if she were struck by an accidental movement or casual movement by the knife.
Vol. XII, at 2177-80.
The evidence in this case could only justify a conviction of the principal charge (capital murder) or the lesser-included offense (murder) and, therefore, the even lesser-included offense (manslaughter) was properly deleted from the instructions. Id. at *871 1330. See this Court's opinion in Wetz v. State, 503 So.2d 803 (Miss. 1987).[19]
Assume arguendo that Holland's unsubstantiated theory were true. Assume, for example, that Krystal had been waving the knife around in a playful manner; that Holland prudently but unsuccessfully attempted to take the knife from her to avert potential injury; and that Krystal died when she rolled off the bed and onto the knife. This scenario alone would not constitute evidence of the crime of manslaughter; rather, it would constitute evidence of innocence of any crime. Holland wouldn't even be guilty of simple negligence.[20]
In sum, the record contains no evidence of absence of malice  the principle element of manslaughter. "The evidence, however, only supports a conviction of the greater offense." Mackbee, 575 So.2d at 23. Restated, Holland failed to compose a convincing argument evincing a sufficient evidentiary basis upon which "a rational or a reasonable juror `could find the defendant not guilty of the principal offense charged in the indictment yet guilty of the lesser included offense.'" Mease, 539 So.2d at 1330 (quoting Monroe v. State, 515 So.2d 860, 863 (Miss. 1987)).
The trial judge did grant an instruction on the lesser-included offense of murder; he could have acted cautiously and granted the manslaughter instruction. In view of the evidence, however, the judge's refusal should be deemed proper. See Boyd, 557 So.2d at 1178 ("For some unknown reason, our competent and able trial judges continue to refuse instructions on lesser included offenses when the evidence warrants them. This in essence allows the jury to hear the defendant's side of the story... . [However,] the trial judge cannot indiscriminately give the instructions.").

6. Issue: Whether Instruction S-2 Was Granted Erroneously?
Under objection by Holland, the trial judge granted the following instruction:
Instruction S-2
The Court instructs the jury that "malice aforethought" as charged in the indictment *872 in this cause and as referred to in other instructions of the Court is a state of mind and does not have to exist in the mind of the slayer for any given length of time, and if the defendant, at the very moment of the fatal blow did so with the deliberate design to take the life of the deceased, Krystal D. King, then it was malice aforethought as if the deliberate design had existed in the mind of the defendant for minutes, hours, days, or weeks or even years.
Vol. I, at 133. Holland contends that this instruction should not have been granted because it "rules out manslaughter[] and is in hopeless conflict with [a] manslaughter instruction." Appellant's Brief at 40-43 (quoting Windham v. State, 520 So.2d 123, 126 (Miss. 1987)). Because the trial judge properly denied the manslaughter instruction, this Court affirms on the issue.

7. Conviction Affirmed
Based upon the foregoing, this Court holds that the evidence presented was sufficient to convince a rational factfinder of Holland's guilt of capital murder and the underlying crime of rape beyond a reasonable doubt.

C. Sentencing-Phase Issues

1. Issue: Whether the Jury's Premature Decision to Sentence Holland to Death Constituted a Reversible Error?
Upon conclusion of the guilt phase, at 2:49 p.m., the judge excused the jury while he and the attorneys discussed some preliminary matters regarding the sentencing phase. Vol. XIV, at 2403-04. At 3:11 p.m., the judge received a note from the jury. The note read: "We, the jury, sentence Gerald James Holland to death." Holland immediately moved for a mistrial, which the judge overruled. Id. at 2407-09. Instead, the judge summoned the jury to the courtroom and instructed it accordingly:
Ladies and gentlemen, I have received your note and I want to let you know that the guilt stage of the trial is over with. There are certain administrative matters that the Court has to dispose of before we get to the second phase, which is the sentencing phase. At that stage there will be, of course, some testimony and I will instruct you as to the law that will govern the deliberations at that stage. Until we get to that point, I instruct you to refrain from any further deliberations. I can't tell you the exact time, but it will be shortly and the Court will bring you back out here and the Court will begin the sentencing phase, the second stage of the  Jury go to the jury room.
Id. at 2411.
The sentencing phase eventually commenced and, after approximately 2 hours and 43 minutes of testimony and argument, the phase concluded. The jury then deliberated for approximately 2 hours and 15 minutes before returning a sentence of death. Id. at 2439-513.
Holland now questions the judge's decision to overrule his motion for a mistrial.

(a) The Parties' Contentions
Holland contends that a mistrial should have been granted because the "jurors not only deliberated prior to the presentation of evidence and instructions, they arrived at a verdict, and thereby abandoned any pretense of impartiality going into the sentencing phase." Appellant's Brief at 5-6 (citing cases).
The State counters that:
It is clear that the jury deliberated some two hours and ten minutes after receiving the instructions of the court at the end of testimony and arguments in the sentence phase of the trial. Clearly the jury followed the instructions of the Court and made the proper findings prior to imposing the sentence of death. The length of time that the jury took to arrive at its verdict demonstrates that it did not simply walk in the jury room and copy the verdict of death down. That would have only taken minutes. The length of time clearly shows that the jury seriously considered the aggravating and mitigating factors prior to arriving at their verdict.
*873 Appellee's Brief at 9. The State adds that jurors are "presumed to follow the instructions of the court." Id. (citing cases). Alternatively, the State contends that, assuming that the judge erred, the error at most should be deemed harmless: "It cannot be said, after considering all the evidence presented, that the jury would not have found that the aggravating circumstances did not outweigh the mitigating circumstances and sentenced the defendant to death." Id. at 10 (citing cases).

(b) Relevant Law and Disposition

i.
The Sixth Amendment, in part, guarantees the criminal defendant the right to a fair trial by an impartial jury. See Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (applying the sixth-amendment right to states through the fourteenth amendment); Gardner v. Florida, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393, 402 (1977) ("sentencing process ... must satisfy the requirements of the Due Process Clause"); Turner v. State, 573 So.2d 657, 670 (Miss. 1990) (constitutional guarantees which are applicable to guilt phase are also applicable to sentencing phase); Dycus v. State, 440 So.2d 246, 257-58 (Miss. 1983) (same).
Jurors must not "discuss a case among themselves until all the evidence has been presented, counsel have made final arguments, and the case has been submitted to them after final instructions by the trial court." State v. Washington, 182 Conn. 419, 438 A.2d 1144, 1147 (1980) (citing several treatises); accord State v. McGuire, 272 S.C. 547, 253 S.E.2d 103 (1979); State v. Drake, 31 N.C. App. 187, 229 S.E.2d 51 (1976).
In short, "each juror [must] keep an open mind until the case has been submitted to the jury." United States v. Klee, 494 F.2d 394, 396 (9th Cir.1974). An open mind is critical because:
[A]n opinion [prematurely] formed could only be removed, if at all, by evidence. This in effect shift[s] the burden of proof and place[s] upon the defendants the burden of changing by evidence the opinion thus formed. A juror having in discussion not only formed but expressed his view as to the guilt or innocence of the defendant, his inclination thereafter would be to give special attention to such testimony as to his mind strengthened, confirmed or vindicated the views which he had already expressed to his fellow jurors, whereas, had there been no discussion and no expression of tentative opinion, he would not be confronted with embarrassment before his fellow jurors should he change the tentative opinion which he might entertain from hearing evidence.
Winebrenner v. United States, 147 F.2d 322, 328 (8th Cir.1945); accord United States v. Aaron Burr, 25 F.Cas. 49, 50 (C.C.Va. 1807) ("Such a person may believe that he will be regulated by testimony, but the law suspects him, and certainly not without reason. He will listen with more favor to that testimony which confirms, than to that which would change his opinion; it is not to be expected that he will weigh evidence or argument as fairly as a man whose judgment is not made up in the case."); Washington, 438 A.2d at 1148 ("Once a juror has expressed an opinion ... the die may well have been cast.").
Admittedly, "not every incident of juror misconduct requires a new trial." Klee, 494 F.2d at 396. A new trial may be unwarranted if the misconduct is proved beyond a reasonable doubt to be harmless. Washington, 438 A.2d at 1149 ("Inasmuch as the error was one of constitutional dimension, it is incumbent upon the state to show that it is harmless beyond a reasonable doubt.") (citing Aillon v. State, 168 Conn. 541, 363 A.2d 49 (1975)). Meeting this burden has generally been a formidable task because, "[a]lmost without exception, where the issue has been properly raised, every court has held that ... [mere] discuss[ion by jurors of] the case before its submission to them constitutes reversible error." Id. at 1148 (citing numerous cases from various jurisdictions); see, e.g., State v. Gill, 273 S.C. 190, 255 S.E.2d 455, 457 (1979) (an oft-cited, capital-murder case which the South Carolina Supreme Court *874 reversed because jurors prematurely commenced deliberations).

ii.
Applying the law to the facts, this Court concludes that the jury's premature deliberations prejudiced Holland's right to a fair hearing during the sentencing phase. A different conclusion may have been reached had the trial judge questioned the jurors in order to determine whether each of them could have remained impartial. See, e.g., United States v. Clapps, 732 F.2d 1148 (3d Cir.1984) (mistrial unwarranted because the trial judge removed two jurors who prematurely deliberated and questioned each of the remaining jurors and determined each was not influenced); United States v. Anello, 765 F.2d 253 (1st Cir.1985) (same); People v. Castillo, 144 A.D.2d 376, 534 N.Y.S.2d 188 (2d Dep't 1988) (same); see also Jones, 461 So.2d at 692 ("trial court is certainly free to employ a second jury if it wishes").
In some jurisdictions, trial judges are required or advised to conduct a thorough inquiry when a juror or jurors prematurely deliberated or formed an opinion. In the case sub judice, the judge merely instructed the jurors to "refrain from further deliberations." This instruction was insufficient to insure that Holland's right to a fair hearing was not prejudiced. The case must be remanded for re-sentencing by an impartial jury.

2. Remaining Issues
In view of this Court's holding that this case must be remanded for re-sentencing, the remaining issues will not be reached. Before concluding, this Court feels compelled to place the State on notice regarding a matter relating to the evidentiary sufficiency of the aggravating circumstance  "previously convicted of ... a felony involving the use or threat of violence to the person." See MISS. CODE ANN. § 99-19-105(5)(b) (1990 Supp.).
To prove that Holland had previously committed a felony involving the use or threat of violence, the State introduced a county court "JUDGMENT" in Texas involving a 1974 criminal conviction for raping a child. This may not constitute sufficient evidence of involvement of violence. This Court recognizes that, generally, rape is a crime inhering the element of violence. However, this Court also recognizes that consensual, non-violent intercourse with an individual under 18 years of age may constitute a violation of this and other states' statutory-rape statute. See, e.g., id. § 97-3-67 (1990 Supp.); see also State v. Gill, 273 S.C. 190, 255 S.E.2d 455, 457 (1979).
Although a trial court is not required to examine the underlying legal validity of the prior conviction, Nixon v. State, 533 So.2d 1078, 1099 (Miss. 1987); Phillips v. State, 421 So.2d 476, 481 (Miss. 1982), determining whether a defendant's prior conviction was a felony involving the use or threat of violence requires that this state's statutes be construed and applied. Where as here the conviction occurred in a sister state, this Court does not look to how that state characterizes the question of whether the crime was one of violence, rather, the analysis must be done under Mississippi law. For a conviction to qualify as predicate for an aggravating circumstance under this state's statutes, the conviction from the sister state must have been acquired under a statute which has as an element the use or threat of violence against the person or, by necessity, must involve conduct that is inherently violent or presents a serious potential risk of physical violence to another. United States v. Sherbondy, 865 F.2d 996, 1010-11 (9th Cir.1988).
The State has this burden of proving beyond a reasonable doubt the existence of each aggravating circumstance. Nixon, 533 So.2d at 1099. On retrial, the trial court should examine the evidentiary sufficiency of this aggravating circumstance.
The Court also notes that the aggravating circumstance of "especially heinous, atrocious or cruel" offense was submitted for jury consideration. The limiting instruction proposed in Coleman v. State, 378 So.2d 640 (Miss. 1979), to channel the jury's discretion in considering this aggravating circumstance, was also granted. *875 The limiting instruction should again be granted if the same aggravating circumstance is submitted. Berry v. State, 575 So.2d 1 (Miss. 1990); Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

III. CONCLUSION
The judgment of the lower court is affirmed on the guilt phase and is reversed and remanded for a new trial on the sentencing phase, consistent with this opinion.
GUILT PHASE: CONVICTION OF CAPITAL MURDER AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
SENTENCING PHASE: REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
HAWKINS, P.J., dissents with separate written opinion.
HAWKINS, Presiding Justice, dissenting:
I respectfully dissent.
Let us first make clear what this case is not. It is not a case where the jury was tampered with, or where some person outside the jury attempted to influence any of them. This is not a case of prosecutorial or judicial misconduct. Everything this jury heard prejudicial to Holland came before it through competent in-court testimony.
The jury's sole sin was reaching a sentencing judgment prematurely, and it did this on its own, unassisted in any way by, or with the approval of the circuit judge.
The cases cited by the majority which were reversed involve instances of the judge's failure to instruct the jury it should not discuss the case before retiring to reach its verdict, or impliedly instructing the jurors it was not illegal for them to do so. State v. Washington, 182 Conn. 419, 438 A.2d 1144 (1980); accord State v. McGuire, 272 S.C. 547, 253 S.E.2d 103 (1979); Winebrenner v. United States, 147 F.2d 322, 328 (8th Cir.1945); see, e.g., State v. Gill, 273 S.C. 190, 255 S.E.2d 455, 457 (1979).[1]
This jury was properly instructed by the circuit judge not to discuss the case before retiring to reach a verdict. This instruction was followed by the jury through rendition of the verdict of guilty.
Then, having lawfully deliberated upon and returned a verdict of guilty of capital murder, through a misapprehension of the jurors themselves, they thought it was time to consider the sentence. When they returned the verdict, the circuit judge promptly told the jury it was premature and it should wait until the sentencing phase was entirely complete before considering its punishment verdict. There is no evidence to suggest but that the jury faithfully followed the circuit judge's corrective instruction. Two and three-fourths hours were spent in presenting evidence in the penalty phase. The jury deliberated two and one-fourth hours before returning the death penalty verdict.
Here is the uncontradicted evidence the jury had heard before it returned the verdict, which the majority finds prejudicial: a fifteen-year-old girl had been beaten all over the face and head, and on the arms, wrists, shins and chest. Her vagina and rectum had been stretched, scraped and torn, consistent with a violent vaginal and rectal rape. Then she had been stabbed through the heart with a knife. Finally, her undergarment was stuffed down her throat suffocating her to death. This had been done to her by a 49-year-old man.
Barring some conscientious scruple against inflicting the death penalty in any case, with just this evidence, what is there to suggest the jury acted abnormally, or any differently than the vast majority of *876 jurors would react in returning the verdict it did?[2]
Another distinguishing factor about this case, and all those cited, is this was a two-stage, bifurcated trial. It is not a case of jurors discussing a case during the course of a trial. Instead, it is a case where the jury did not discuss the case or deliberate upon it until it was instructed to do so. And, it is unrealistic to suppose that each juror in considering the verdict of guilt, about which he was instructed to deliberate, did not at the same time think about the punishment. A rational thought process cannot be restricted in such a manner.
The criticism of the majority and the cases cited is that by this premature sentencing verdict, the defense was forced to require the jury to change its mind, and psychologically this is an added burden Holland should not have had imposed upon him.
But, as I just noted, during their lawful discussion and deliberation in reaching a verdict of guilty of capital murder, how could jurors escape thinking of the punishment they would soon be required to mete out as a consequence of this verdict?
No defense counsel in his right mind would be unaware of the task confronting him when he went into the sentencing phase in any event that a good portion of the jurors had made up their minds to inflict the death penalty.
The jurors' expression in open court simply manifested a state of mind defense counsel and Holland surely must have known existed in any event.
The judge, lawyers, Holland and the jurors knew from the beginning of trial that the jurors would have to take two steps in Holland's trial. It was inevitable that each juror in taking that first step would also gravely contemplate the second step it required.
The defense surely knew it had its work cut out for it in persuading a good portion of that jury to change their minds, in any event. It simply is not realistic to conjecture otherwise from the evidence in this case and the two stages of deliberation required of the jury.
Nor do I buy the argument that it was psychologically difficult for the jurors to change their minds, and this imposed a prejudicial burden upon Holland. This underestimates both the intelligence and integrity of the jury. It is true that men and women are not prone to change their minds when they have made it up after reflecting upon some matter in the absence of some additional thought or fact not theretofore brought to their attention.
But all of us change our minds daily as facts develop, as can be witnessed by any motorist approaching a red light. How many lawyers can tell of experiences where, when the jury retired to reach a verdict, a majority initially voted one way on the first vote only to reach the opposite conclusion after full deliberation?
It is a tempest in a teapot argument that what occurred in this case denied Holland a fair and impartial sentencing hearing.
Of course, any case of this sort must be considered upon the facts before it. In United States v. Klee, 494 F.2d 394 (9th Cir.1974), "eleven of the fourteen jurors (including alternates) discussed the case during recesses and nine of the jurors expressed premature opinions about Klee's guilt." 494 F.2d at 395. The Court of Appeals held:
What is involved here is the premature discussion among the jurors themselves about the case. Assuming there was juror misconduct, it is still true that not every incident of juror misconduct requires a new trial... . The test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial.
.....
When a wise and experienced judge, who presided at the trial and observed the jury, comes to such a conclusion, it is not *877 for us to upset it. The trial judge "was in a better position than we are to determine whether what happened was prejudicial."
494 F.2d at 396.
In Commonwealth v. Scanlan, 9 Mass. App. 173, 400 N.E.2d 1265 (1980), the Massachusetts Court of Appeals held:
While the internal discussion among jurors in the face of daily instructions from the judge to the contrary was undesirable ... we would embark on a slippery slope indeed if we began to monitor and evaluate the internal procedures of the jury... .
The jury sat sequestered for sixteen days; it is not realistic that the jurors would succeed in keeping their lips sealed in the face of the alternating drama and tedium of the trial. In the interior workings of a jury there is room for impropriety that is short of unlawfulness.
400 N.E.2d at 1272.
There will always be a concern, a sense of unease, on the part of judges and lawyers as to what bridling is necessary to be placed upon a jury in reaching its verdict.
The right of trial by jury is of ancient origin. Judges and lawyers, however, have made rules restricting what the jurors should be allowed to hear or see, and rules telling them how they in turn are to judge what they do see and hear.
The jury system is the genius of Anglo-Saxon jurisprudence. No other system on this planet approaches it in achieving two salutary objectives: reaching the just, or right result, and giving the average citizen the comfort that his voice will be heard and considered by his peers, men and women of his own level of understanding in human affairs.
Judgment as to what is a "just" or "right" decision can change with the times. Nothing, however, can match the comfort of having men and women of your own stature pass upon the merits of your case. The public at large in turn feels far more comfortable with a 12-man jury verdict, whatever it is, than it would with the same result having been reached by some judge.
Efforts to emasculate being fully, fairly judged by men and women drawn from society at large are dangerous encroachments upon liberty.
The legal profession, above all others, should revere the jury system and its function. The judiciary should avoid the arrogance of thinking that somehow we are better qualified to pass judgment on the affairs of life, and therefore entitled to place whatever bridle we deem fit upon a jury in reaching its verdict. We would be wiser to place more confidence and trust in the jury system, and give jurors more credit than we sometimes do for having the intelligence, integrity and sense of fairness to reach the proper decision in the case before them. We should be quite wary in encumbering them with unnecessary legal baggage in reaching their verdicts.
The understandable abhorrence of judges in the infliction of death as a punishment motivates, and perhaps affords, the best examples of pure judicial tinkering and meddling with the jury system. The judiciary has imposed layer upon layer of rules to "guide," to "channel" juries' decisions in these cases.
I have yet to read any statistical analysis revealing how these layers of guides have affected jury verdicts, or of what benefit they have been. The rules have, however, given appellate courts additional reasons to reverse.
The judicial horse is woefully swaybacked from court-imposed criminal procedures emanating from death penalty cases. Frequently a decade in litigation is required to complete one of these cases. Moreover, these criminal rules encumber not only death penalty trials, but the entire criminal justice system.
Rather than choosing dubious technical devices to find error in the verdict imposing a death penalty, this Court would be wiser to accept the responsibility, and duty we do have to inquire into a death penalty verdict, imposed upon us by statute. Our State would also be far better served thereby. By Miss. Code Ann. § 99-19-105(5)(6) (Supp. 1990), this Court is charged with the *878 obligation to determine from the record on appeal whether the death sentence should be set aside.
§ 99-19-105. Review by supreme court of imposition of death penalty.
(5) ... In addition to its authority regarding correction of errors, the court, with regard to review of death sentences shall be authorized to:
(a) Affirm the sentence of death; or
(b) Set the sentence aside and remand the case for modification of the sentence to imprisonment for life.
(6) The sentence review shall be in addition to direct appeal, if taken, and the review and appeal shall be consolidated for consideration. (Emphasis added)
This statute grants no authority to this Court to abolish the death penalty; it does afford a practical and common-sense safety valve whereby the highest court in this State is empowered to look at all the facts on the record, and aside from any errors and as another jury, determine whether sentence of death is warranted. While this Court of recent years has not been reluctant to assert rule-making power in varied instances in which there is neither constitutional nor statutory authority, strangely in death penalty cases where we have been given this specific statutory responsibility, upon no occasion has a majority of this Court felt empowered to exercise it. Bullock v. State, 525 So.2d 764 (Miss. 1987); Edwards v. State, 441 So.2d 84, 93-94 (Miss. 1983). Also, Leatherwood v. State, 435 So.2d 645 (Miss. 1983), Hawkins, P.J., dissenting at 657. Rather than opting for dubious technical reasons to reverse, we would better serve the law, save our State enormous expense, and murder victims' families years of heartbreaking suspense if we exercised our responsibility under the statute.
This case has no ground for reversal, and I would affirm.
NOTES
[1] Holland had filed a motion in the Harrison County Circuit Court for a change of venue, which Judge Vincent Sherry had granted.
[2] Holland's discussion of this issue involves a contention that the allegedly-improper custodial interrogation which led to his incriminating statements violated both his fifth and sixth amendment rights to counsel. In view of the facts, the sixth amendment has no application in this case. See Arizona v. Roberson, 486 U.S. 675, 685, 108 S.Ct. 2093, 2100, 100 L.Ed.2d 704, 715-16 (1988) (discussing subtle distinctions between the fifth and sixth amendment rights to counsel); State v. McNeil, 155 Wis.2d 24, 454 N.W.2d 742, 745-79 (1990) (same); State v. Stewart, 113 Wash.2d 462, 780 P.2d 844, 846-53 (1989) (same).
[3] Notably, one federal circuit court has held that an ambiguous utterance means all interrogation must cease  including that intended to clarify. See Maglio v. Jago, 580 F.2d 202, 205 (6th Cir.1978).
[4] The Minnesota Supreme Court recently opined that a murder suspect's utterance during questioning  "... I'm just going to need me a good lawyer, ya know ..."  was neither ambiguous nor unambiguous because it was "fleeting," "off-hand," "in mid-sentence," and "about his future need for a good attorney." Thus, the Court held that the interrogators' subsequent questioning about the murder, which led to a confession, was proper. State v. Hale, 453 N.W.2d 704, 708 (Minn. 1990); compare with Robinson v. Borg, 918 F.2d 1387, 1391-93 (9th Cir.1990) (construing the following utterance as unambiguous: "I have to get me a good lawyer, man. Can I make a phone call?").
[5] The Ninth Circuit Court of Appeals considers "conditional" utterances to be unambiguous invocations to Fifth Amendment rights. Robinson v. Borg, 918 F.2d 1387, 1392 (9th Cir.1990). The following is an example:

SUSPECT: Can I talk to a lawyer? At this point, I think you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?
Smith v. Endell, 860 F.2d 1528, 1531 (9th Cir.1988). On the other hand, the Ninth Circuit noted that utterances inhering the word  "might," "maybe," or "perhaps"  would generally be deemed ambiguous. Robinson, 918 F.2d at 1393 (citing cases).
[6] Further support for the conclusion that Holland's question does not rise to the level of an unambiguous invocation is the fact that courts have consistently "avoid[ed] attributing a talismanic quality to the word `attorney' falling from a suspect's lips." United States v. Porter, 764 F.2d 1, 18 (1st Cir.1985). In other words, "any mention of an `attorney' is not necessarily an invocation of the right to counsel or even an equivocal request for present representation." Id. (citing several cases); see also Norman v. Ducharme, 871 F.2d 1483, 1486 (9th Cir.1989) ("Mere mention of an attorney does not constitute an equivocal request for counsel, as the word `attorney' is not talismanic.") (citing cases); State v. Hale, 453 N.W.2d 704, 708 (Minn. 1990) ("[N]ot every mention of the word `lawyer' or `counsel' or `attorney' by a suspect `arguably' suggests that the suspect wants a lawyer before submitting to further questioning.") (citing cases).
[7] Compare with Robtoy v. Kincheloe, 871 F.2d 1478, 1479 & 1482-83 (9th Cir.1989) (To clarify a murder suspect's ambiguous request  "Maybe I should call my attorney"  the interrogator explained that "if you want your attorney, this conversation ends right here." The suspect said he "understood," and the interrogator then told him that the "questioning would proceed and `if we arrived at a point [when he] didn't want to answer any questions, he didn't want to say anymore, or he wanted his attorney, to say so.'" The suspect said "okay" and confessed. Held: Clarification did not "impinge[] on the exercise of the suspect's continuing option to cut off the interview.); Owen, 849 F.2d at 539-40 (To clarify a murder suspect's ambiguous utterance  "I think I'll let ya'll appoint me one"  the interrogators "proceeded to question [him] about his involvement in the murder." Held: Such questioning violated Miranda.); Fouche, 833 F.2d at 1286-89 (To clarify a robbery suspect's ambiguous utterance  "What should I do?"  the interrogator explained that he was not a lawyer, could not give legal advice, and wanted to know if he wished to make a statement about the robberies. Held: Proper clarification.); Thompson, 601 F.2d at 769 & 772 (To clarify a murder suspect's ambiguous utterance  that he "desire[d] to make a statement but ... that he first wanted to tell his story to an attorney"  the interrogators inaccurately advised that "an attorney could not relate [his] story to the police ... and that an attorney would probably advise him to say nothing." Held: Clarification  which was "materially incorrect," "presumptive," and "persuasive"  was improper and overreaching.); Nash, 597 F.2d at 516 (To clarify a murder suspect's ambiguous utterance  "I would like to have an attorney, but I would rather talk to you"  the interrogator explained that he "had hoped that [they] might talk about" the crime, but that if he wanted an attorney, the interrogation would "have to stop right now." Held: Proper clarification.); Berry v. State, 575 So.2d 1, 5 (Miss. 1990) (To clarify a murder suspect's ambiguous utterance  "[I changed my mind,] I don't want to call [an attorney]"  the interrogators asked: "Well, are you still willing to talk to us?" Held: Proper clarification.); State v. Montez, 309 Or. 564, 789 P.2d 1352, 1356-59 (1990) (To clarify capital-murder suspect's ambiguous utterance  "I think I need a lawyer to talk about the rest of it so I don't get linked up"  an interrogator asked if "he was telling us that he wanted an attorney and did not want to talk to us anymore." The suspect replied "no"  after which the interrogator repeated that he had a right to have an attorney present and asked "if that's what he wanted." The suspect replied that "that is not what he wanted." The interrogator then asked if he was "still willing to talk to us?" The suspect replied that he would "talk ... without one" and then related incriminating statements. Held: Proper clarification.); see also Hovland v. Blodgett, 914 F.2d 262 (9th Cir.1990) (unpublished opinion located in WESTLAW, database "Allfeds") (The suspect responded to interrogators' questioning about a murder: "I think I have reached the point where I think I should be thinking about an attorney." One of the interrogators then left the interrogation room, returned several minutes later, pointed to a telephone and telephone book within the suspect's reach, and told the suspect that "the Judge had authorized [the suspect] to open the phone book, call any attorney and ask him to be present at no expense to him." The suspect "indicated he understood but took no further action." The interrogators resumed questioning and the suspect confessed. Held: Admittedly, the interrogators did not "explicitly" clarify the suspect's ambiguous utterance before resuming questioning. Nonetheless, the waiver was valid because the suspect's own inaction constituted sufficient clarification of the ambiguity.).
[8] As noted, validity of a waiver under Mississippi law must be proved beyond a reasonable doubt. See Section II(A)(1) of this opinion.
[9] The tape containing Holland's confession reveals no slurring or incoherence.
[10] Holland contended that the detectives "badgered" him, which led him to "give in" and confess. The record provides absolutely no evidentiary support for this allegation.
[11] Holland characterized Terrell's statement  "Douglas has told us his [story]; we'd like to hear [yours]"  as coercive. Terrell's statement simply does not evince coercion. Accord Nash, 597 F.2d at 519 (Nash uttered an ambiguous invocation of his right to have an attorney present, which the interrogator clarified: "Okay. I had hoped that we might talk about this [crime], but if you want a lawyer appointed, then we are going to have to stop [the interrogation] right now." Held: Clarification not coercive. (emphasis added)).
[12] Rule 403 provides that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
[13] The pillow case and the wash cloth are the only items which Holland challenged on the ground of excessive blood stain.
[14] Holland contends that this questioning was prejudicial because:

[He] had denied raping [Krystal]... . Given this, evidence that bruises attributable to forced intercourse were inflicted at a time when only [he] was awake was plainly devastating to [his] defense.
Appellant's Brief at 31.
[15] See also Middlebrook v. State, 555 So.2d 1009, 1011 (Miss. 1990) ("We have repeatedly held an accused's remedy for tardy disclosure of that to which he was entitled in pre-trial discovery is a continuance reasonable under the circumstances.") (citing Moore v. State, 536 So.2d 909, 911 (Miss. 1988); Stewart v. State, 512 So.2d 889, 893 (Miss. 1987); Foster v. State, 484 So.2d 1009, 1011 (Miss. 1986)); West v. State, 553 So.2d 8, 18 n. 6 (Miss. 1989) ("motion for a mistrial in this context is the functional equivalent of a motion for a continuance"); Cockrell v. State, 566 So.2d 1243, 1246 (Miss. 1990) (Rule 4.06(i) guideline is "premised on the view that prejudice determinations may be best made by the party affected.").
[16] Holland merely questioned McGarry for "about ten or fifteen minutes" and for the purpose of merely ascertaining how long the State had known about his opinions. Vol. XII, at 2071-82 & 2097-98.
[17] This announcement transpired outside the jury's presence during a debate about the admissibility of some allegedly-irrelevant photographs. The witness testifying at the time was Biloxi Police Officer Robert Burriss. Vol. X, at 1706; Vol. XI, at 1831, 1835 & 1841.
[18] Holland also raises several related sub-issues and cites "critical occasions" when errors were allegedly committed. Holland's discussion of these issues comprises only several sentences. Appellant's Brief at 36. Holland is procedurally barred from raising these issues because he either cites support for his contention which is different from the support he cited at the trial level or he failed to raise the issue at trial. "A trial judge cannot be put in error on a matter which was not presented to him for decision." Pruett v. Thigpen, 665 F. Supp. 1254, 1262 (N.D.Miss. 1986); see Read v. State, 430 So.2d 832, 838 (Miss. 1983); Ponder v. State, 335 So.2d 885, 886 (Miss. 1976); Stringer v. State, 279 So.2d 156, 157-58 (Miss. 1973).
[19] In Wetz, the defendant had been charged with murdering his seven-month-old daughter. He contended that his daughter's death was the result of an accident, but the jury did not believe him. On appeal, the defendant challenged the trial judge's refusal to grant his instruction on the lesser-included offense of manslaughter. This Court concluded: "Because the defendant was the only eyewitness to the child's death and because he argues strenuously a theory of accident, we have reviewed the record dispassionately and with great care... . Finding no error in the proceedings below, we affirm." 503 So.2d at 805. Cf. State v. O'Daniel, 62 Haw. 518, 616 P.2d 1383, 1390 (1980) (In this case, the Hawaii Supreme Court rejected the defendant/appellant's contention that the jury should have been instructed on his theory that the victim's death was the result of an accident. The only evidence to support the appellant's theory was his story "regarding an accidental shooting" which he apparently related via telephone to a police dispatcher immediately after the incident. The Court held that such evidence, without more, is "insufficient to raise a jury issue on accidental death since the evidence is speculative.").
[20] See Phillips v. State, 379 So.2d 318, 320 (Miss. 1980) ("[I]nvoluntary manslaughter by culpable negligence within the meaning of [§ 97-3-47] may be defined as negligence of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life, and that this be so clearly evidenced to place it beyond a reasonable doubt."); Gant v. State, 244 So.2d 18, 19 (Miss. 1971) (simple negligence does not reach the degree required under § 97-3-47); see also People v. Minnis, 118 Ill. App.3d 345, 74 Ill.Dec. 179, 189, 455 N.E.2d 209, 219 (4th DCA 1983) ("The gist of involuntary manslaughter is recklessness... . Under the defendant's theory of the case, the death was the result of ... an accident ...; if an accident, she is not guilty of anything. There was no error in refusing the instruction on involuntary manslaughter."); State v. Miller, No. 81AP-316, slip. op. at 7 (Ohio App. Dec. 31, 1981) (1981 WESTLAW 3714) (The court of appeals held that the manslaughter instruction was properly refused because the defendant's contention that the shooting was an accident "would be a complete defense to the charge of aggravated murder." The court added: "[I]f defendant's [theory] were believed, the defendant should have been acquitted."); cf. State v. Pendergrass, 803 P.2d 1261, 1264-65 (Utah App. 1990) (In this murder case, the court held that the defendant's claim that the victim's death was the result of an accident did not warrant granting a manslaughter instruction.); State v. Griffith, No. 82AP-105, slip op. at 3 (Ohio App. Feb. 17, 1983) (1983 WESTLAW 3363) ("[T]here is no defense of accident; rather, a failure of proof of guilt of an intentional act.").
[1] One illustrative case will suffice. In State v. Washington, the trial judge told jurors it was permissible for them to discuss trial evidence daily.
[2] In oral argument Holland's counsel informed the Court that he had no real hope that the jury, with the evidence before it, would reach any other verdict than guilty. He recognized he had virtually no defense for the guilt phase of the trial.