CHANDLER, Justice,
concurring in part and in result:
¶ 171. I concur in part and in 'result with the majority opinion. I write separately to explain my position in this case. The trial court erred by admitting the expert-witness testimony of William Jones, the DNA Section Chief of the Mississippi Crime Laboratory, as the testing methodology failed to comport with the Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), standards. At trial, Jones testified that the test results allegedly showed that *526 blood on a tennis shoe recovered from the Kansas landfill matched Linda Heintzel-man’s blood. The admission of this evidence was erroneous because it failed to meet the standards in Daubert adopted by this Court in Mississippi Transportation Commission v. McLemore, 868 So.2d 31 (Miss.2003). However, even under the heightened standard of review in death-penalty cases, this admission was harmless error due to the overwhelming weight of the evidence presented at trial against Gil-lett. It is for these reasons that I concur in part and in result with the majority opinion.
I.
¶ 172. The standard of review for a conviction of capital murder and sentence of death requires heightened scrutiny. Brown v. State, 890 So.2d 901, 907 (Miss.2004). “While we may apply different standards for different questions — for example, a review of the admission of evidence — we always apply a heightened scrutiny.” Id. “Under this method of review, all doubts are to be resolved in favor of the accused because what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.” Loden v. State, 971 So.2d 548, 562 (Miss.2007).
II.
¶ 173. In Ross v. State, 954 So.2d 968, 992 (Miss.2007), this Court stated “[t]he admissibility of evidence rests within the discretion of the trial court, and reversal is appropriate only when a trial court commits an abuse of discretion resulting in prejudice to the accused.” Ross, 954 So.2d at 992. This Court will reverse where the trial court’s discretion has been abused and a substantial right of a party has been affected. Id. at 996. This Court is mindful that a trial court’s discretion must be exercised within the confines of the Mississippi Rules of Evidence. Id. See Kolberg v. State, 829 So.2d 29, 55 (Miss.2002) (admissibility of evidence rests within the discretion of the trial court and this Court will reverse where the trial court has abused its discretion); Miss. R. Evid. 103(a) (“Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected....”)
¶ 174. In McLemore, 863 So.2d at 38, this Court analyzed the admission and exclusion of expert testimony. This Court adopted the test as stated in Daubert, and as modified in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), to determine admissibility of expert-witness testimony. McLemore, 863 So.2d at 35.
¶ 175. When the issue arises of whether a trial court erred by the admission or exclusion of expert testimony, Mississippi Rule of Evidence 702 provides the framework for analysis. Rule 702 states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Miss. R. Evid. 702. Under Rule 702, expert testimony may be admitted where it is determined to be both relevant and reliable. Ross, 954 So.2d at 996 (citing McLemore, 863 So.2d at 38). Relevant testimony is that which assists the trier of fact in understanding or determining a fact at issue. Id. Reliable testimony is when an *527 expert’s testimony is “based on the methods and procedures of science, and not merely on subjective beliefs or unsupported speculation.” Id. at 996-97. See Daubert, 509 U.S. at 587, 113 S.Ct. 2786.
¶ 176. This Court also considers the Daubert factors, which are: (1) whether the theory can be, and has been, tested; (2) whether the theory has been published or subjected to peer review; (3) any known rate of error; and (4) the general acceptance that the theory has garnered in the relevant expert community. Edmonds v. State, 955 So.2d 787, 791 (Miss.2007) (citing Daubert, 509 U.S. at 593-94, 113 S.Ct. 2786).
¶ 177. The testimony presented at the pretrial Daubert hearing, as it related to the testing methods used on a blood sample stored in a red-top vial, did not meet Daubert standards. Jones’s expert testimony proved to be irrelevant and unreliable, therefore, his testimony and consequent test results should have been excluded at trial. The blood-test results were woefully short and were not based on reliable principles or methodologies, which in turn undermined the relevance of the results.
¶ 178. Jones testified about the various types of tops for blood-sample tubes. The vast majority of the crime lab’s testing samples have either purple or yellow tops. Purple-top tubes contain EDTA, a preservative. Yellow-top tubes also have a preservative in them. Red-top tubes, in contrast, contain no preservative. This means that a blood sample collected and stored in a red-top tube has nothing to prevent blood from clotting, from producing bacteria, or from decomposing in the tube.
¶ 179. The State requested that the crime lab compare two blood samples from the victims with blood found on a tennis shoe to determine whether there was a DNA match. Jones testified that, although he characterized the blood samples of Heintzelman and Hulett on his reports to be “poor” and “putrefied,” respectively, the DNA evidence on the shoe matched Heintzelman’s blood sample.
¶ 180. Jones also testified about the written protocol used by the crime lab when conducting testing. He said the crime laboratory has a written protocol for DNA testing. The protocol has been tested in validation studies and is accepted as a reliable method of collecting, storing, and analyzing blood samples. While the protocol does not explicitly exclude red-top-tube testing, the protocol, according to Jones, specifically mentions that purple-top tubes are preferred for samples. Jones stated that he did not know of a validation study that explicitly permitted the use of red-top tubes for DNA comparisons. Jones stated that a purple-top tube was preferred, but that he was “absolutely convinced that if you get a DNA profile from a red-top tube, that it would be the same as from the purple-top tube of that individual.” He provided no validation studies to support this statement.
¶ 181. Dr. D’Eustachio also testified at the hearing and expressed his opinion that the crime lab (1) did not follow the testing standards contained in an FBI Quality Assurance Audit for Forensic DNA and Convicted Offender DNA Databasing, and (2) the results of the DNA testing were not based on reliable scientific principles or methodology. He stated that performing an analysis without a validation protocol would be similar to an “experiment.” Likewise, the test results, in Dr. D’Eusta-chio’s opinion, were unreliable due to an irregularity in the peak heights in the results. Further, even if the results were explainable with reasons for the causes of the irregular pattern, Dr. D’Eustachio opined that a validation study needed to be conducted. He stated:
*528 I couldn’t see any regularity in the pattern or any other symptom that would even let me make a good hypothesis. And even if I could make a good hypothesis as to what might be causing this, of course one would then need to do a validation study in which one tried to repeat those conditions and cause the same kind of abnormal variation to occur again, then at least we would understand what was causing it.
Dr. D’Eustachio determined that the test results were irregular and could not be interpreted to a reasonable degree of medical certainty.
¶ 182. Because the DNA testing failed to follow the appropriate protocol and was not based on any validation study for red-top tubes, the testing and, ultimately, the results failed to meet DaubeH standards. Edmonds, 955 So.2d at 791. The DNA evidence was not collected and tested in compliance with reliable scientific principles or methodologies.
¶ 183. For these reasons, the trial court erred by admitting the State’s expert testimony on its DNA analysis.
III.
¶ 184. We must now determine whether admitting this evidence was harmless error. In Kolberg v. State, 829 So.2d 29, 67 (Miss.2002), a death-penalty case, this Court stated the basic test for harmless error as ‘the inquiry is not whether the jury considered the improper evidence or law at all, but rather, whether the error was unimportant in relation to everything else the jury considered on the issue in question.” Kolberg, 829 So.2d at 67 (quoting Tanner v. State, 764 So.2d 385, 399-400 (Miss.2000)).
¶ 185. This test for harmless error reaches back to the United States Supreme Court case Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). “The Chapman test is whether it appears ‘beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.’ ” Thomas v. State, 711 So.2d 867, 872 (Miss.1998). “Nonstructural, constitutional errors in the face of ‘overwhelming evidence of guilt’ are harmless errors.” Brown v. State, 995 So.2d 698, 704 (Miss.2008). In Brown, this Court further stated:
The U.S. Supreme Court “ha[s] repeatedly recognized that the commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal. Instead, ‘most constitutional errors can be harmless.’ ” Washington v. Recuenco, 548 U.S. 212, 218, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006) (quoting Neder v. United States, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)).
Brown, 995 So.2d at 704.
¶ 186. In Holland v. State, 587 So.2d 848, 865 (Miss.1991), this Court determined whether the admission of a wash cloth was error in a death-penalty case. While the Court determined that the trial court erred by admitting a wash cloth recovered from a grave because it lacked connection to Holland or his home, the admission was harmless because of the overwhelming weight of the evidence against the defendant. Id.
¶ 187. Like this Court’s decision in Holland, the admission of the expert-witness testimony at Gillett’s trial was harmless error based on the overwhelming weight of the evidence. Indeed, it is reasonable to conclude that the erroneous admission of the DNA comparison results of the victims’ blood to the bloody tennis shoe recovered from the Kansas landfill had little or no effect on the guilty verdict reached by the jury.
¶ 188. Investigation led to the recovery of seven garbage bags of items from a *529 Kansas landfill. Employees from the landfill stated that Gillett and a female had disposed of items on two occasions. Personal property belonging to Hulett and Heintzelman were recovered from the garbage bags. The recovered items included Hulett’s wallet with his driver’s license; Heintzelman’s wallet with her driver’s license; a work shirt and pants with Hu-lett’s name on them; a blood-stained crocheted pillow, later determined to match pillows from Hulett’s and Heintzelman’s residence in Hattiesburg; and New Balance tennis shoes with blood-like stains.
¶ 189. In Hattiesburg, law enforcement officers discovered a shoe print with a reddish stain at Hulett’s and Heintzel-man’s residence, temporarily shared with Gillett and his girlfriend, Lisa Chamberlin. One of the tennis shoes recovered from the Kansas landfill matched the shoe print in Hattiesburg and was determined to be the source of the print. Simply from the evidence recovered at the landfill, whether the blood on the tennis shoe matched Heintzelman’s blood was inconsequential. These facts, in conjunction with all the other competent evidence put forth, render the improper DNA evidence insignificant.
¶ 190. At trial, other overwhelming evidence was produced for the jury’s consideration. Some of this evidence included statements from Gillett’s friends that Gil-lett said that he had taken the truck, killed the owners, and the owners were in the back of the truck. Law enforcement officers found Heintzelman’s truck and a freezer containing the victims’ bodies at the Gillett farm. Hulett’s mother identified the freezer as belonging to the victims. Gillett’s fingerprints were on the freezer and on the tape securing the freezer lid in a closed position. Also, the victims’ home in Hattiesburg showed signs of foul play such as blood-like stains, ripped-out carpeting, and a tampered safe.
¶ 191. Given the overwhelming evidence produced at trial, the admission of the DNA testimony was harmless.
IV.
¶ 192. For the above stated reasons, I concur in part and in result with the majority opinion.