# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-KA-00590-SCT

*ANTONIO SAUCEDA REYES a/k/a ANTONIO REYES*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/22/2024 |
| TRIAL JUDGE: | HON. KELLY LEE MIMS |
| TRIAL COURT ATTORNEYS: | KYLE DAVID ROBBINS |
| | RICHARD BENJAMIN McMURTRAY |
| | JOHN DAVID WEDDLE |
| | CLAYTON MATTHEW CUMMINGS |
| | MEGAN DIANE FRENCH |
| | ANDREW WALLACE STUART, II |
| | BRYCE ADAM MONTGOMERY |
| | RICHARD D. BOWEN |
| | NATHAN H. ELMORE |
| COURT FROM WHICH APPEALED: | ALCORN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | NATHAN H. ELMORE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | JASON D. HERRING |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/28/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., MAXWELL AND GRIFFIS, JJ.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1. Antonio Reyes appeals his capital-murder conviction and life sentence. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. In April 2017, Detective Michael Suitor with the Corinth Police Department

responded to the home of Shomarick Payne. Payne had been shot in the back of the head, his pants were partially pulled down, and the pant pockets were turned inside out. The house appeared to have been ransacked. A 9 mm shell casing that had been fired was found near Payne's body as well as a clear plastic bag of cocaine. No gun was found in Payne's home, but 9 mm ammunition was found in his bedroom.

¶3.     The case went cold until 2019 when Payne's father reached out to Detective Suitor with information. Based on the information, three suspects were developed—Antonio Reyes, Steven Patterson, and Sanchez Sorrell. Because there was not enough probable cause to make an arrest, the case again went cold.

¶4.     In February 2021, Reyes was arrested on an unrelated charge, and Detective Suitor used that opportunity to question him about Payne's murder. During the interview, which was video recorded, Reyes admitted he had information about Payne's murder, but he denied being at Payne's house when the shooting occurred. According to Reyes, Patterson and Sorrell left his house to go rob Payne. When Patterson and Sorrell returned to Reyes's house, they had what Reyes believed to be Payne's gun. Patterson was acting very nervous, and Sorrell was crying.

¶5.     After his interview with Reyes, Detective Suitor spoke with Patterson, who had also been arrested on unrelated charges. Detective Suitor also spoke with Zachariah Tays, who voluntarily approached Detective Suitor and provided a statement regarding Payne's murder. Based on his interviews with Patterson and Tays, Detective Suitor interviewed Reyes again in March.

¶6. During the second interview, which was video recorded, Reyes's story changed. This time, Reyes admitted that he was present at Payne's house when Payne was shot and that he had witnessed Payne's murder. Reyes explained that the plan was to set up a drug deal, pretend to buy $100 of cocaine from Payne, and then rob and kill Payne. Reyes stated that he participated in the plan by providing the $100 for cocaine. According to Reyes, he was supposed to get back the $100 after Payne was robbed.

¶7. Shortly after Reyes's second interview, Detective Suitor interviewed Sorrell. Sorrell's interview was video recorded.

¶8. Reyes, Patterson, Sorrell, and Tays were indicted and charged with capital murder. Both Sorrell and Tays pled guilty to lesser charges—Sorrell to manslaughter and burglary, and Tays to accessory after the fact. Patterson pled guilty to murder and was sentenced to life imprisonment.

¶9. Before trial, Reyes moved to suppress his statements made during both interviews with Detective Suitor. According to Reyes, "[he] may have been impaired and/or intoxicated, and the statements were coerced and thus provided unknowingly, unintelligently and involuntarily." After a suppression hearing, the trial court denied the motion.

¶10. At trial, multiple witnesses testified on behalf of the State including Detective Suitor, Sorrell, and Tays. Reyes's interviews with Detective Suitor were introduced into evidence and played for the jury. Reyes was ultimately convicted of capital murder and sentenced to serve a term of life imprisonment without the possibility of parole. Reyes filed a motion for a judgment notwithstanding the verdict or, alternatively, a new trial, which the trial court

3

denied. Reyes appealed.

¶11. On appeal, Reyes argues (1) the trial court erred by denying his motion to suppress statements, (2) the State improperly vouched for its witness, (3) the trial court erred by allowing the State to play portions of Sorrell's prior recorded statement, and (4) Reyes received ineffective assistance of counsel.

## DISCUSSION

I. *Whether the trial court erred by denying Reyes's motion to suppress statements.*

¶12. Reyes argues that the trial court erroneously denied his motion to suppress statements because his statements during both interviews were made involuntarily. "The standard of review for admission of evidence is abuse of discretion." *Taylor v. State*, 330 So. 3d 758, 761-62 (Miss. 2021) (internal quotation marks omitted) (quoting *Jones v. State*, 303 So. 3d 734, 736-37 (Miss. 2020)). "When a trial court has overruled a motion to suppress the confession of a defendant, this Court will reverse the trial court's decision if the ruling was 'manifestly in error or contrary to the overwhelming weight of the evidence.'" *Lott v. State*, 380 So. 3d 929, 931 (Miss. 2024) (internal quotation marks omitted) (quoting *Taylor*, 330 So. 3d at 762). "The applicable standard for determining whether a confession is voluntary is whether, taking into consideration the totality of the circumstances, the statement is the product of the accused's free and rational choice." *Greenlee v. State*, 725 So. 2d 816, 826 (Miss. 1998) (internal quotation marks omitted) (quoting *Porter v. State*, 616 So. 2d 899, 907-08 (Miss. 1993)).

¶13. "The prosecution has the burden of proving beyond a reasonable doubt that the

4

confession was voluntary." *Id.* (citing *Haymer v. State*, 613 So. 2d 837, 839 (Miss. 1993)). The "burden is met and a prima facie case made out by testimony of an officer, or other persons having knowledge of the facts, that the confession was voluntarily made without threats, coercion, or offer of reward." *Id.* (internal quotation marks omitted) (quoting *Chase v. State*, 645 So. 2d 829, 838 (Miss. 1994)). "[W]here the State has laid the 'proper predicate,' the onus is then on the defendant to provide other evidence or testimony on the voluntariness issue to rebut the State's assertion." *Id.* (quoting *Cox v. State*, 586 So. 2d 761, 764 (Miss. 1991)). "Once a determination of voluntariness is made by the trial court, the defendant bears a heavy burden in attempting to reverse the trial court's finding that the confession is admissible." *Keller v. State*, 138 So. 3d 817, 850 (Miss. 2014) (internal quotation marks omitted) (quoting *Blue v. State*, 674 So. 2d 1184, 1204 (Miss. 1996), *overruled on other grounds by King v. State*, 784 So. 2d 884, 889-90 (Miss. 2001)).

¶14.    Reyes admits that the trial court followed the proper procedure. He argues, however, that "the trial court erred . . . in finding the two statements[1] admissible" since (1) the "first statement was taken the morning after a day of heavy drinking . . . coupled with . . . considerable pill[s]" and (2) the "second statement was made after the interrogators made threats . . . as well as promises[.]" Reyes further argues that during the second interview, "[w]hen [he] asked about getting a lawyer, instead of stopping to clarify whether [he] was invoking his right to counsel, the officers continued the interrogation."

### A.    First Interview

---

[1] To be clear, Reyes did not move to suppress "two statements." Instead, he moved to suppress all statements made during the two interviews with law enforcement.

¶15.     Reyes argues that his statements made during the first interview are inadmissible and should have been suppressed because the statements were provided involuntarily "prior to having become sober." In support, Reyes relies on his testimony and his wife's testimony at the suppression hearing.

¶16.     Reyes testified that on the day he was arrested on unrelated charges, he snorted roxicodone[2] when he woke up that morning, began drinking beer and whiskey around 1:00 p.m., and began snorting cocaine around 5:00 p.m. He further testified that he drank a lot of beer and tequila that night at dinner. According to Reyes, he did not have a clear memory of meeting with and talking to Detective Suitor because he was high at the time. Reyes noted a mistake he had made during his interview, specifically that he had mistakenly stated that he had completed the eleventh grade when in fact he had only completed the tenth grade.[3]

¶17.     Reyes's wife also testified regarding his drug and alcohol use. She testified that on the day of his arrest, Reyes drank beer for about five hours before they went to dinner and continued drinking beer and tequila at dinner. She further testified that although she did not see Reyes use drugs that day, she could tell when he was high based on how angry he gets and how his eyes look. She explained that when Reyes goes on a drug and alcohol binge, he typically sleeps late the next day and that it takes him nearly twenty-four hours to clear his mind.

---

[2] Roxicodone is a "narcotic pain reliever [that] works by dulling the pain perception center in the brain." https://www.drugs.com/misspellings/roxycodone.html (last visited Aug. 19, 2025).

[3] Reyes never denied knowing how to read and write.

6

¶18. But despite this testimony, all law-enforcement officers involved testified that Reyes did not appear intoxicated or under the influence of drugs or alcohol. Officer Samuel Gaskin, the arresting officer, testified that Reyes did not seem impaired by alcohol or drugs, that he effectively communicated, that his speech was fine, that he did not smell of alcohol, and that he understood what was happening.

¶19. Detective Suitor interviewed Reyes more than twelve hours after Reyes's arrest.[4] According to Detective Suitor, Reyes did not exhibit any behavior that indicated he was intoxicated or under the influence of drugs or alcohol at the time of the interview. Detective Suitor testified that Reyes read and understood his *Miranda*[5] rights and that Reyes did not have any trouble providing the personal information contained in the waiver of rights form such as his name, date of birth, address, phone number, and level of education. Detective Suitor further testified that Reyes understood his questions and what was going on, that Reyes spoke clearly, that Reyes was in control of his faculties, that Reyes was not shaking, and that Reyes exhibited no signs of mania.

¶20. Detective Dale Green was also present during the first interview. Detective Green testified that at no time during the interview did Reyes appear intoxicated or under the influence and that Reyes was able to communicate effectively.

¶21. Reyes's interview with Detectives Suitor and Green was video recorded. The video was played for the trial court during the suppression hearing and is included in the record.

---

[4] Reyes was arrested around 10:30 p.m. on February 21, 2021. The interview began at 11:04 a.m. on February 22, 2021.

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

7

The video reflects that Reyes was coherent, spoke clearly, communicated effectively, had no trouble recalling or providing information to the detectives, and understood what was going on. As the trial court noted,

It's uncontested that [Reyes] was drinking prior to the officer's involvement and may have even drank a lot. May have even used cocaine and pills and all these other things.

But the officer testified when he took him in that night, he didn't . . . seem to think he was overly intoxicated at that time.

But more importantly, 12 hours later, we have his statement on video. And regardless of what all of you have said and argued about, I got to see it live. And from what I could tell, you know, although he may have been a little hung over, he seemed to have coherent understanding, able to carry about reasonable conversations. He had control of his faculties. . . . He didn't seem irritable, nervous, trembling, or easily excitable. Actually[,] he seemed the opposite, calm and collected[.]

. . . .

So, watching the video[], I see nothing to lead me to believe that [Reyes] was intoxicated or incoherent or unable to testify or make statements and willfully waive any rights he had[.]

¶22. The record reflects that the trial court did not abuse its discretion by admitting into evidence Reyes's statements made during the first interview with Detectives Suitor and Green. *Taylor*, 330 So. 3d at 761-62 (quoting *Jones*, 303 So. 3d at 736-37). The trial court's denial of Reyes's motion to suppress statements made during the first interview was not "manifestly in error or contrary to the overwhelming weight of the evidence." *Lott*, 380 So. 3d at 931 (internal quotation marks omitted) (quoting *Taylor*, 330 So. 3d at 762). Considering the totality of the circumstances, this Court finds that Reyes's statements during the first interview were "the product of [his] free and rational choice." *Greenlee*, 725 So.

8

2d at 826 (internal quotation mark omitted) (quoting *Porter*, 616 So. 2d at 907-08). Accordingly, the trial court did not err by denying Reyes's motion to suppress statements made during the first interview.

### B. Second Interview

¶23. Reyes was interviewed a second time by Detective Suitor on March 9, 2021. Detective Bo Swindle also participated in the second interview. The second interview was video recorded. The video was played for the trial court during the suppression hearing and is included in the record. The video begins with Reyes providing Detective Suitor with his full name, date of birth, phone number, level of education, and confirmation that he can read and write. Detective Suitor then advised Reyes of his *Miranda* rights and asked whether Reyes understood these rights and wanted to talk. Reyes responded affirmatively. The remaining applicable portions of the video are as follows:

| | |
|---|---|
| Investigator Suitor: | Did you see who else is in jail? |
| Reyes: | (Nods his head affirmatively.) |
| Investigator Suitor: | Who all did you see? |
| Reyes: | I just see Steven [Patterson] . . . . |
| Investigator Suitor: | Did you see Zac [Tays]? |
| Reyes: | No. |
| Investigator Suitor: | Zac's back there too . . . . They decided they were going to tell the truth. . . . You ain't been fully truthful because you were there. Were you not there when they killed [Payne]? |
| Reyes: | Not in there but . . . . |

9

| | |
|---|---|
| Investigator Suitor: | Listen, uh, Antonio, you're going to go down real hard if you don't start being honest, like really, really hard, like you ain't gonna see the light of day, ok. You need to give me a truthful statement today about the murder of Shomarick Payne. Because you see that laptop and all that stuff on my desk, I've got recordings of Steven Patterson's statement of what happened. I have recordings of Zac Tays who was there and who admits to being there along with you and along with Sanchez Sorrell. So I need you to start from the beginning and if you want any kind of mercy from the [district attorney], work any kind of deal, today's the day, ok. . . . So, if you're not the trigger man, you need to tell me everything that happened and everything that you saw because I'm going to tell you, Steven said you killed [Payne]. . . . |
| Reyes: | No, I didn't kill him. . . . I'm not lying to you. |
| Investigator Suitor: | You're lying to me about being there though because you were there. . . . |
| Reyes: | I was there with Zac because Zac asked to go, so we went. |
| Investigator Swindle: | You need to be really truthful. Last time you were sitting here, you told us that you were not there, not there at all and we know that's a lie. . . . We know more than you think we know. . . . You need . . . to start telling the truth . . . . |
| Investigator Suitor: | You wanna start from how all of this began, where it began at and how it all played out? |
| Reyes: | How bad will it mess me up if I don't get a lawyer, that is my question. |
| Investigator Suitor: | Well, you know you already lied to us. I'm not going to tell you to get one. I'm not going to tell you not to get one. But I'm telling you, this is my opinion, if I were sitting where you were, I'd be |

10

|  |  |
|---|---|
|  | telling the truth right now. . . . |
| Reyes: | Ok. |
| Investigator Suitor: | You want to see what these other guys are saying? You can look at it if you want to do that before you make your decision ok, to know that we're being honest with you. |
| Reyes: | (Nods his head affirmatively). |
| Reyes: | (Watching the video recorded statements from Patterson and Tays). I can't believe it. . . . He's lying. |
| Investigator Suitor: | . . . Let's talk. . . . Now that you see what we got, you need to tell the truth. |

¶24. Reyes argues that the statements he made during the second interview were the result of threats and promises and are therefore inadmissable. He further argues that his right to counsel was violated.

### 1.      *Threats and Promises*

¶25. "If a confession is the result of threat, inducements or promises—however slight—it is not voluntary[.]" ***Burford v. State***, 320 So. 3d 502, 511 (Miss. 2021) (internal quotation marks omitted) (quoting ***Manix v. State***, 895 So. 2d 167, 180 (Miss. 2005)). "The test of whether an inducement is sufficient to render a confession involuntary is whether the promise or inducement 'is of a nature calculated under the circumstances to induce a confession irrespective of its truth or falsity[.]'" ***Id.*** (alteration in original) (quoting ***Robinson v. State***, 157 So. 2d 49, 51 (Miss. 1963)). "Exhortations by police for the suspect to 'tell the truth' or to 'come clean' are allowed." ***Id.*** (quoting ***Flowers v. State***, 601 So. 2d 828, 830 (Miss.

1992)). "But attempts by law enforcement officers to induce a confession by promising to obtain a bond or a lighter sentence for the accused are impermissible." *Id.* (citing *McNeil v. State*, 308 So. 2d 236, 238-39 (Miss. 1975)).

¶26. Reyes asserts that "the video starts out with" threats, i.e., "you're going to go down real hard if you don't start being honest" and a promise of leniency, i.e., "if you want any kind of mercy from the [district attorney], work any kind of deal, today's the day." But despite Reyes's assertion, the video does not begin with threats or promises. Instead, the video begins with Detective Suitor getting basic information from Reyes such as his full name and date of birth and then advising Reyes of his *Miranda* rights. And as the video clearly reflects, Reyes voluntarily waived his *Miranda* rights and agreed to talk to Detectives Suitor and Swindle before any discussion occurred.

¶27. Moreover, the video reflects that Reyes's statements were not "the result of threat, inducements or promises[.]" *Burford*, 320 So. 3d at 511 (quoting *Manix*, 895 So. 2d at 180). Detectives Suitor and Swindle explained to Reyes that they had spoken with the other individuals involved and present at Payne's house at the time of the shooting, that they knew Reyes was lying about his presence at the scene, and that Reyes needed to tell the truth. There is nothing to indicate that Reyes's statements regarding his side of the story were made as the result of any threats or promises by Detectives Suitor or Swindle. Instead, the video reflects that Reyes voluntarily provided his statements after he heard what the other individuals, specifically Patterson, had said about him and his involvement in the shooting.

¶28. Reyes also asserts that he was threatened with the death penalty "off camera" before

the video recording started. But the two detectives present during the second interview disputed this and testified that this was not true. "[T]he resolution of conflicting testimony regarding voluntariness is a question of fact to be resolved by the trial judge at the suppression hearing." *Bell v. State*, 963 So. 2d 1124, 1134 (Miss. 2007) (internal quotation marks omitted) (quoting *Morgan v. State*, 681 So. 2d 82, 89 (Miss. 1996)). The trial court, sitting as the finder of fact at the suppression hearing, "had the sole authority to weigh the credibility of the witnesses and decide in the state's favor" on this contested point. *Johnson v. State*, 129 So. 3d 148, 152 (Miss. 2013) (quoting *Glasper v. State*, 914 So. 2d 708, 720 (Miss. 2005)).

### 2. Right to Counsel

¶29. Reyes argues that Detective Suitor violated his right to counsel since Detective Suitor continued the interview after he "ask[ed] about an attorney." "In determining whether a defendant's right to counsel has been violated, this Court must" "determine whether the defendant actually invoked his right to counsel." *Chamberlin v. State*, 989 So. 2d 320, 332 (Miss. 2008) (citing *Holland v. State*, 587 So. 2d 848, 856 (Miss. 1991)). "If the defendant invoked this right, he 'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" *Id.* (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)).

¶30. "A defendant's request for counsel must be interpreted broadly 'whether the defendant's request is explicit or equivocal.'" *Id.* (quoting *Holland*, 587 So. 2d at 856).

"Determining whether a defendant invoked his right to counsel is an objective inquiry." *Id.* (citing *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994)). "Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Id.* (internal quotation marks omitted) (quoting *Davis*, 512 U.S. at 459). "A defendant must 'articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" *Id.* (quoting *Davis*, 512 U.S. at 459).

> The Supreme Court explained in *Davis* that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning."

*Id.* (quoting *Davis*, 512 U.S. at 459).

¶31.    Here, the video reflects that Reyes's question—"how bad will it mess me up if I don't get a lawyer?"—was not an unequivocal invocation of the right to counsel. Indeed, Reyes's question was not a "sufficiently clear[] . . . request for an attorney" or "some statement that c[ould] reasonably be construed to be an expression . . . for the assistance of an attorney." *Id.* (internal quotation marks omitted) (quoting *Davis*, 512 U.S. at 459). Instead, his question was an ambiguous invocation of his right to counsel. *See Holland*, 587 So. 2d at 857 (defendant's question "Don't you think I need a lawyer?" constituted an ambiguous invocation of his right to an attorney (internal quotation marks omitted)).

¶32.    Notably, in response to Reyes's question, Detective Suitor explained that he could not

tell Reyes to get an attorney or not to get an attorney, but Detective Suitor offered Reyes the opportunity to see what the other individuals had said about him before making his decision regarding counsel. After Reyes saw the other video statements, he never asked for an attorney or invoked his right to counsel. Instead, Reyes freely and voluntarily provided his version of events to Detectives Suitor and Swindle. Because Reyes never made an unambiguous or unequivocal request for an attorney, neither Detective Suitor nor Detective Swindle had an obligation to stop questioning Reyes. *See Fletcher v. State*, 381 So. 3d 410, 416 (Miss. Ct. App. 2024) ("[I]t is now clear, under both the Federal Constitution and the Mississippi Constitution, that officers have no obligation to stop questioning a suspect in the absence of an unambiguous or unequivocal request for an attorney or assertion of the right to remain silent." (emphasis omitted) (quoting *Piccaluga v. State*, 337 So. 3d 1142, 1152-53 (Miss. Ct. App. 2021))).

¶33. The record reflects that the trial court did not abuse its discretion by admitting into evidence Reyes's statements made during the second interview with Detectives Suitor and Swindle. *Taylor*, 330 So. 3d at 761-62 (quoting *Jones*, 303 So. 3d at 736-37). The trial court's denial of Reyes's motion to suppress statements made during the second interview was not "manifestly in error or contrary to the overwhelming weight of the evidence." *Lott*, 380 So. 3d at 931 (internal quotation marks omitted) (quoting *Taylor*, 330 So. 3d at 762). Considering the totality of the circumstances, this Court finds that Reyes's statements during the second interview were "the product of [his] free and rational choice." *Greenlee*, 725 So. 2d at 826 (internal quotation mark omitted) (quoting *Porter*, 616 So. 2d at 907-08).

15

Accordingly, the trial court did not err by denying Reyes's motion to suppress statements made during the second interview.

  II.  *Whether the State improperly vouched for its witness.*

¶34. Sorrell was one of the State's witnesses at trial. During Sorrell's direct examination, the State questioned Sorrell about the shooting:

| | |
|---|---|
| State: | [A]t the time that you went outside, who was still in Shomarick's house? |
| Sorrell: | It would have probably been Patterson and Reyes. |
| State: | Okay. Patterson and Reyes w[ere] in the house. Where was Tays? |
| Sorrell: | If I'm correct, he probably was out in the car. |
| State: | Okay. Okay. And then what did you hear while you were outside? |
| Sorrell: | I heard a gunshot. |
| State: | All right. Do you know about how long were you outside . . . before you heard a gunshot? |
| Sorrell: | A couple minutes. |
| State: | Okay. What did you do when you heard the gunshot? |
| Sorrell: | I was fixing to go back, but he caught me at the door and told me I didn't want to go in. |
| . . . . | |
| State: | I understand. So you're going back to the door, going back towards the door after you heard the gunshot, what happened then? |
| Sorrell: | I never made it back in the house. |

16

State:      All right. Why was that?

Sorrell:    Patterson was at the door.

State:      Steven Patterson was at the door. And why did you not go in?

Sorrell:    He told me it wasn't no smart decision for me to go back in or I might get killed, so I didn't go back in.

State:      Okay. Do you know exactly what he said?

Sorrell:    I don't want to say I do know exactly what was said because I don't want to quote something wrong and then I just gave a oath that I'm telling the truth.

State:      I understand. I've always told you to tell the truth, right?

Sorrell:    Exactly.

State:      Okay. That's all we want you to do in court, the truth. And if you don't know, that's an okay answer, too, as long as it's the truth. Okay?

Sorrell:    All right.

State:      But it has to be truth. If you do know, you tell them what you know.

Sorrell:    Yeah.

State:      All right? So Mr. Patterson told you what? Not a quote, but what did he tell you?

Sorrell:    He said, You are going to die if you go in there.

State:      . . . . Okay. Did you go in?

Sorrell:    No, I ain't never go in.

¶35.   On redirect, the State questioned Sorrell as follows:

State:      Mr. Sorrell, just to . . . clear up a couple of things, . . . you got

17

some questions about a deal and about the transcript from your guilty plea.

. . . .

State: [A]long those lines, the deal that was talked about, . . . I said that you would agree to testify, right?

Sorrell: Yeah.

State: Okay. That you would agree to testify how?

Sorrell: Testify.

State: Truthfully.

Sorrell: Yeah.

State: And have I ever told you what to say?

Sorrell: No. I told—I said what I knew went down that day.

State: Okay. And, in fact, in the plea hearing, I said that you would testify truthfully, consistent with this statement, right? This statement right here?

Sorrell: Yeah.

State: All right. You had never met me when you made this statement, had you?

Sorrell: Not that I know of.

¶36. Reyes argues that the State's "questions were designed to assure the jury that Sorrell was telling the truth" and therefore constituted improper vouching. "Attempts to bolster a witness by vouching for his credibility are normally improper and error." *United States v. Ellis*, 547 F.2d 863, 869 (5th Cir. 1977). According to Reyes,

The State engaged in a lengthy colloquy with Sorrell designed to tell the jury

18

that the State was insisting that Sorrell testify truthfully and Sorrell was promising to testify truthfully. . . . The State then used this as a springboard to assure the jury that Sorrell was being completely truthful, soliciting irrelevant testimony about Sorrell's agreement to testify. This was prosecutorial misconduct and requires that Reyes'[s] conviction be reversed.

But Reyes's argument is procedurally barred.

¶37. As the record reflects, Reyes failed to object to the questioning at trial. "Generally, a party who fails to make a contemporaneous objection at trial must rely on plain error to raise the issue on appeal, because otherwise it is procedurally barred." *Parker v. State*, 30 So. 3d 1222, 1227 (Miss. 2010) (citing *Walker v. State*, 913 So. 2d 198, 216 (Miss. 2005)). "The plain error doctrine permits this Court to 'recognize obvious error which was not properly raised by the defendant and which affects a defendant's "fundamental, substantive right."'" *Fisher v. State*, 354 So. 3d 284, 290 (Miss. 2022) (quoting *Shinstock v. State*, 220 So. 3d 967, 970 (Miss. 2017)). Notably, Reyes does not assert or rely on plain error. Accordingly, this issue is procedurally barred. *Parker*, 30 So. 3d at 1227 (citing *Walker*, 913 So. 2d at 216).

¶38. Notwithstanding the procedural bar, Reyes's argument is without merit. The record is clear that the State's questions of Sorrell focused on the directive that he testify truthfully. The State did not vouch for or express a personal belief in Sorrell's credibility. The State simply reminded Sorrell that he had to testify truthfully.

> III.    *Whether the trial court erred by allowing the State to play portions of Sorrell's interview with law enforcement during his redirect examination when Sorrell had not repudiated anything in the interview.*

¶39. During his direct examination, Sorrell testified that he, Tays, Patterson, and Reyes

19

went to Payne's house to buy drugs and that he was unaware of any plan to rob or kill Payne. Sorrell explained, however, that after the drugs were purchased, he got the feeling that something was off because there "was too much lingering around[.]"

¶40. Sorrell further testified that all of them wanted to go to Payne's house to buy drugs. When the State asked if he had previously told Detective Suitor that it was Reyes's idea to go to Payne's house to buy drugs, Sorrell responded that he did not remember what he had said because it had been "some time ago." The State then referenced a portion of Sorrell's interview with Detective Suitor in which Sorrell stated that Reyes needed to get some "powder." When asked if that was what he had told Detective Suitor, Sorrell responded, "I might have . . . I don't remember exactly what I said that day."

¶41. On cross-examination, Sorrell agreed that he did not remember whose idea it was to go to and get drugs at Payne's house. He further agreed that he had no idea about a plan to rob or kill Payne. Sorrell acknowledged that he did not remember every word he had said during his interview with Detective Suitor, but he agreed that playing the video recorded interview would refresh his recollection.

¶42. During Sorrell's redirect examination, the trial court allowed the State to play portions of Sorrell's interview with Detective Suitor in order "to try to refresh [Sorrell's] recollection . . . of things he said he didn't remember." The video excerpts were not admitted into evidence.

¶43. After the video excerpts were played, the following discussion occurred:

State:     All right. Did you hear those two statements?

20

Sorrell:      Yeah, I heard them.

State:        All right. And that's you and that's your interview from back in 2021, right?

Sorrell:      (Nodded head affirmatively.)

State:        So did you say a couple of times that it was [Reyes]'s idea to go buy the cocaine from Shomarick that day?

Sorrell:      That's what I said.

State:        Okay. Is that true?

Sorrell:      If that's what I said back then, got to be true.

State:        So it's true?

Sorrell:      Yeah.

State:        When you were asked a question about when you didn't know—you had no idea what everybody's real intentions were when y'all went over there; is that right?

Sorrell:      That's right.

State:        Okay. But by the time y'all left, you knew that there was more to it than just buying powder, right?

Sorrell:      Yep.

¶44.   Reyes argues:

What happened here is that the State played the video and Sorrell admitted to having made the statement. But the video could only have been played if Sorrell had denied making the statement. What the jury improperly saw and heard was several minutes of Sorrell stating that it was Reyes'[s] idea to buy drugs and then Sorrell vouching for Payne's character and a statement by Sorrell that the whole thing had to be part of a bigger conspiracy.

The State should know the proper method for impeaching a witness with a prior inconsistent statement and this was not it. Since Sorrell admitted

21

to having said that it was Reyes'[s] idea to buy drugs, it was error to introduce the video. As it was, the jury, which was never given a limiting instruction that the video was not substantive evidence, had no way to know that it was introduced for impeachment and not for the truth of the matter.

. . . .

[T]he [S]tate may refresh a witness'[s] recollection with a prior statement[,] but the witness is allowed to review the statement first and readopt it or not. It is only if the witness denied making the prior statement that the statement would be admissible and then only for impeachment and not as substantive evidence. Here[,] the [S]tate skipped a step when it played the recordings for the jury. Since Sorrell never denied making the statements, they were not admissible.

What the [S]tate should have done in this situation was have Sorrell view the video . . . without the jury seeing it. After Sorrell admitted making the statement, the video should not have been played.

But, once again, this issue is procedurally barred.

¶45.   Reyes failed to object to the video being played or to the State's line of questioning. And Reyes fails to assert or rely on plain error.  As a result, this issue is procedurally barred. *Parker*, 30 So. 3d at 1227 (citing *Walker*, 913 So. 2d at 216).

*IV.     Whether Reyes received ineffective assistance of counsel.*

¶46.   Reyes last argues he received ineffective assistance of counsel.  "Ordinarily, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Archer v. State*, 986 So. 2d 951, 955 (Miss. 2008).  We "may, however, address an ineffectiveness claim on direct appeal if the presented issues are based on facts fully apparent from the record." *Dartez v. State*, 177 So. 3d 420, 423 (Miss. 2015) (citing M.R.A.P. 22).

¶47.   To prove ineffective assistance of counsel, the defendant must show (1) that counsel's

22

performance was deficient and (2) that the deficiency prejudiced the defense. ***Strickland v. Washington***, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To show deficient performance, a defendant must show that counsel's performance "fell below an objective standard of reasonableness." ***Id.*** at 688. But a strong presumption exists that counsel's performance constituted trial strategy and was "within the wide range of reasonable professional assistance." ***Id.*** at 689. Prejudice is demonstrated by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Id.*** at 694.

¶48. Reyes argues that his "[d]efense counsel's failure to object to the vouching of Sorrell and the improper impeachment of Sorrell or to request a limiting instruction are all instances of ineffective assistance of counsel." But "counsel's choice of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections fall within the ambit of trial strategy[.]" ***Saddler v. State***, 297 So. 3d 234, 240 (Miss. 2020) (alteration in original) (internal quotation marks omitted) (quoting ***Bell v. State***, 879 So. 2d 423, 438 (Miss. 2004)). Similarly, "trial counsel's decision to not request a jury instruction falls under the category of trial tactics, which are not subject to review." ***Neal v. State***, 15 So. 3d 388, 406 (Miss. 2009) (internal quotation marks omitted) (quoting ***Smiley v. State***, 815 So. 2d 1140, 1148 (Miss. 2002)). While Reyes asserts that defense counsel's errors "resulted in extreme prejudice," he fails to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Strickland***, 466 U.S. at 694.

¶49. Because none of Reyes's arguments require reversal based upon ineffective assistance of counsel, his ineffective-assistance-of-counsel claim fails.

## CONCLUSION

¶50. Reyes's capital-murder conviction and life sentence are affirmed.

¶51. **AFFIRMED.**

**RANDOLPH, C.J., KING AND COLEMAN, P.JJ., MAXWELL, CHAMBERLIN, ISHEE, SULLIVAN AND BRANNING, JJ., CONCUR.**